**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-2187**

TRUSTGARD INSURANCE COMPANY,

Plaintiff – Appellee,

v.

SHARON COLLINS; DOROTHY L. JACKSON, individually and as Executor of
the Estate of Alfred Jackson Sr.; JOHN A. GODFREY; MATTIE E. RENDER,

Defendants – Appellants,

and

MICHAEL BROWN, individually, d/b/a Triple S Transport,

Defendant.

Appeal from the United States District Court for the District of South Carolina at Columbia.
J. Michelle Childs, District Judge.  (3:17-cv-00807-JMC)

Argued:  May 7, 2019                                    Decided:  November 5, 2019

Before HARRIS, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

Vacated and remanded by published opinion.  Judge Richardson wrote the majority
opinion, in which Judge Quattlebaum joined.  Judge Harris filed an opinion concurring in
the judgment.

**ARGUED:** Maxwell Kent Thelen, SUMMERVILLE FIRM, Atlanta, Georgia, for Appellants. Peter Harris Dworjanyn, COLLINS & LACY, PC, Columbia, South Carolina, for Appellee. **ON BRIEF:** Kurt Kastorf, SUMMERVILLE FIRM, Atlanta, Georgia, for Appellants.

RICHARDSON, Circuit Judge:

This case involves an attempt to have the federal courts resolve an insurance dispute. A passenger injured in an automobile accident has asserted claims in state court against several people involved. She has also sued a third party, Michael Brown, not present at the accident, claiming he is also liable. Brown's insurer asks us to decide whether an endorsement attached to his insurance contract requires the insurer to pay any judgment against Brown that might result from the ongoing state-court proceedings. The district court issued a declaratory judgment in favor of the insurer. However, we conclude the district court abused its discretion when it assumed jurisdiction under the Declaratory Judgment Act.

## I.

In 2014, Dorothy Jackson rear-ended a car trailer being towed by a Dodge tow truck. The collision injured both Jackson and her passenger, Sharon Collins. Collins sued the driver and the owner of the tow truck (Mr. McWilliams)[1] in a South Carolina Court of Common Pleas. And she sued the owner of the car trailer (Kerion Murray) as well as two other passengers in the tow truck (James Moore and Gerroll Lingard). Collins also asserted claims against Michael Brown, who does business as "Triple S Transport." Although Brown did not own any of the vehicles and was not present at the scene, it appears that

---

[1] The limited record provides mixed signals on whether Mr. McWilliams's first name is Jerome or Michael. *Compare* J.A. 9, 116, 133, 148 (referring to Mr. McWilliams as "Jerome McWilliams"), *with* J.A. 9, 133, 148 (also referring to Mr. McWilliams as "Michael McWilliams").

3

McWilliams's tow truck displayed Brown's Interstate Commerce Commission number. According to Collins, McWilliams towed the car trailer on Brown's behalf. Though neither the complaint nor the record detail how, Collins's state-court suit appears to claim that Brown and McWilliams are each both directly and vicariously liable for the accident.

As the state lawsuit proceeded, Brown's insurance provider asked the federal district court to declare whether it must pay any judgment against Brown if Collins prevails in state court. Brown and McWilliams are, by coincidence, both insured by Appellee Trustgard Insurance Company. Trustgard does not contest that it must cover a judgment against McWilliams if he is found liable to Collins for the negligent operation of the tow truck. But Trustgard does claim that it need not cover a judgment against Brown for damages arising from an accident in which neither Brown nor his insured vehicles were involved. Trustgard seeks a declaratory judgment to that effect.

Trustgard included an endorsement along with Brown's traditional insurance policy. That endorsement, called an "MCS-90" endorsement, is not technically insurance. Rather, it is a surety agreement that requires Trustgard to pay up to $1,000,000 for "any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles." J.A. 88. Federal law requires that a motor carrier have an endorsement like this (or some substitute) to establish a minimal financial responsibility baseline. 49 C.F.R. §§ 387.7, 387.9, 387.15; *see generally Carolina Cas. Ins. Co. v. Yeates*, 584 F.3d 868, 873–74 (10th Cir. 2009) (describing the legal and regulatory framework).

4

The endorsement serves a risk-shifting function for the benefit of an adversarial party. When it applies, the insurer is obligated to pay a judgment against the insured. But upon payment, the insurer may demand reimbursement from the insured. Thus the insurer—not the adversarial party—bears the risk of the insured's nonpayment. So if the endorsement applies here, Trustgard would be on the hook for a final judgment against Brown. And Trustgard could then seek to recover a payment from Brown. If the endorsement does not apply, then Collins must seek to recover a judgment against Brown from Brown himself—she cannot recover from Trustgard.[2]

Granting summary judgment for Trustgard, the district court determined that neither Brown's insurance nor the surety endorsement applied. First, the court concluded that Brown's insurance did not apply because the accident did not involve a covered vehicle. Because the court found that Brown and McWilliams had not entered into "an owner-operator agreement or lease agreement," J.A. 152, the court also rejected Collins's argument that Brown was liable for McWilliams's negligence as "the motor carrier for hire on the job." J.A. 152. Collins also argued that Brown might be liable under a theory of negligent hiring, training, or supervision; but the court determined that any such liability did not fall within the scope of Brown's policy.

Second, the district court determined that the surety endorsement did not apply. Here, the court reasoned that the purpose of the statutorily mandated endorsement is to

---

[2] We set aside any theories supporting joint and several liability under South Carolina law because they do not impact the analysis at hand.

5

protect the people injured by motor carriers by ensuring that they can recover up to the limits of the required insurance coverage. Concluding that McWilliams's policy covered the accident beyond the required amount, the court held that Brown's endorsement could not be "stacked" on top of McWilliams's insurance coverage. J.A. 155.

After the district court entered judgment, Collins asked it to reconsider based on two new theories of liability. First, Collins argued that Brown might be vicariously liable for McWilliams's negligence because they had a master-servant relationship. And second, Collins contended that Brown negligently entrusted his Interstate Commerce Commission number to McWilliams. The district court denied Collins's request, concluding that, even if Brown were found liable under either theory, Trustgard would not be on the hook.

## II.

### A.

Before we address the prudence of exercising jurisdiction under the Declaratory Judgment Act, we first note our uncertainty about whether we have Article III jurisdiction at all. *See Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40 (1937) ("The Declaratory Judgment Act of 1934, in its limitation to 'cases of actual controversy' . . . is operative only in respect to controversies which are such in the constitutional sense."). The district court considered only one jurisdictional issue: its exercise of diversity jurisdiction. But "[s]tanding is a jurisdictional issue we must consider independently." *Gen. Tech. Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 118 (4th Cir. 2004).

The "irreducible constitutional minimum of standing" requires the petitioner to allege a concrete injury that is "actual or imminent, not conjectural or hypothetical." *Lujan*

*v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted).[3]

Ripeness, another justiciability doctrine, determines when a case or controversy is fit for federal judicial review. "[I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner,* 387 U.S. 136, 148−49 (1967).[4]

These constitutional doctrines ensure that we do not exceed the limits of Article III judicial power, *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), and so guard against our rendering of an opinion "advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007) (internal citations omitted). Instead, we must wait until the case has "taken on fixed and final shape so that [we] can see what legal issues [we are] deciding, [and] what effect [our] decision will have on the adversaries." *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952) (internal citations omitted).

Trustgard's alleged injury—that it might have to guarantee a future judgment against Brown—is of a hypothetical and contingent nature: the injury may or may not

---

[3] *Lujan* articulated three elements of standing: (1) injury in fact, (2) causation, and (3) redressability. 504 U.S. at 560–61.

[4] Though distinct doctrines, the Supreme Court has explained that justiciability problems, like those here, can often be described as either standing or ripeness while addressing the same fundamental question. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014) (noting that the "doctrines of standing and ripeness originate from the same Article III limitation" and may "boil down to the same question" (internal citations omitted)).

occur depending on the outcome of the state lawsuit. If Collins does not win a state-court judgment against Trustgard's insured, then a decision from this Court concerning Trustgard's obligation to guarantee such a judgment will have no effect. Thus, before any determination of liability, we risk issuing an advisory opinion.

For this reason, we have found unripe for adjudication a suit seeking indemnification against both "expenses and possible liability" that might arise from pending lawsuits filed after two workers were killed during the unloading of a ship. *A/S J. Ludwig Mowinckles Rederi v. Tidewater Const. Co.*, 559 F.2d 928, 931 (4th Cir. 1977). Like the litigants before us, the parties in that case wished to know who would ultimately be responsible for paying any judgment obtained by the estates of the two men killed (and a third who was injured). Yet we refused to decide that question because it was unripe until liability was determined.[5] As here, indemnification turned on the relationship and relative responsibility among the potential wrongdoers—facts that remained unclear. *Id.* at 933.

In doing so, we distinguished duty-to-defend cases that addressed who was required to pay the costs of defending a suit prior to judgment. *Id.* at 932; *see also Ellett Bros. v. U.S. Fid. & Guar. Co.*, 275 F.3d 384, 388–89 (4th Cir. 2001). Thus, suits about the duty to indemnify—unlike the duty-to-defend suits—would ordinarily be advisory when the insured's liability remains undetermined. *Compare Lear Corp. v. Johnson Elec. Holdings*

---

[5] In *A/S J. Ludwig Mowinckles Rederi*, we described the problem in terms of ripeness but acknowledged that "the question of the ripeness of a claim for adjudication in a federal court is essentially a question of the judicial power of the court over the claim and whether the court should exercise that power." 559 F.2d at 931 n.4.

*Ltd.*, 353 F.3d 580, 583–85 (7th Cir. 2003) ("We regularly say that decisions about indemnity should be postponed until the underlying liability has been established."), *with Med. Assurance Co. v. Hellman*, 610 F.3d 371, 381–82 (7th Cir. 2010) (permitting a declaratory judgment action addressing an insurer's duty to defend because "[t]hat question is sufficiently distinct from the issues that have arisen thus far in the state proceedings"). And here, we do not face any claim about Trustgard's duty to defend the state lawsuit, only to pay a resulting judgment.

That courts may not issue advisory opinions is one of the most long-standing and well-settled jurisdictional rules, reflected as early as 1793 when the Supreme Court refused to render an advisory opinion for President Washington. *See* Letter from Supreme Court Justices to George Washington (Aug. 8, 1793), *in* 13 THE PAPERS OF GEORGE WASHINGTON, PRESIDENTIAL SERIES 392–93 (Christine Sternberg Patrick ed., 2007). Although we recognize how valuable it might be for the parties to know an insurer's obligations before liability is resolved, practical value cannot overcome this fundamental limitation on our jurisdiction.

That said, we need not resolve this constitutional question today. Even if jurisdiction could constitutionally be exercised, we should not do so. Though we must generally decide jurisdictional questions first, we may address "a discretionary jurisdictional question before a nondiscretionary jurisdictional question." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 100 n.3 (1998) (citing *Moor v. Cty. of Alameda*,

9

411 U.S. 693 (1973), as an example).[6]  So in *Sinochem International Co. v. Malaysia International Shipping Corp.*, 549 U.S. 422 (2007), the Supreme Court held that a court may dismiss a case on forum non conveniens grounds, without first addressing personal and subject-matter jurisdiction.  That was because the Court could first address questions that "involve[] a deliberate abstention from the exercise of jurisdiction."  *Id.* at 430.  We may thus look to whether jurisdiction *should* have been exercised in this declaratory judgment action without first addressing whether Article III jurisdiction exists.

**B.**

We now turn to that question—whether the district court should have exercised jurisdiction in this case.  Although the district court here did not expressly address whether it *should* issue a declaratory judgment, it went ahead and issued one on the merits.  We review that implicit decision to exercise jurisdiction for abuse of discretion.  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289–90 (1995).

Under the Declaratory Judgment Act, a district court, in "a case of actual controversy within its jurisdiction . . . *may declare* the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a) (emphasis added).  This Act gives federal courts discretion to decide whether to declare the rights of litigants.

---

[6] The Court in *Moor* permitted a discretionary declination of pendent jurisdiction, without first addressing whether a federal court's pendent jurisdiction could ever extend to state-law claims against a new party.  The *Steel Co.* Court also blessed the decision in *Ellis v. Dyson*, 421 U.S. 426, 436 (1975), which permitted the declination of jurisdiction based on abstention without first addressing whether a "case or controversy" was presented.  *Steel Co.*, 523 U.S. at 100 n.3.

*Wilton*, 515 U.S. 277 at 286.  Rather than grant litigants a right to judgment in their case, it merely permits the courts to hear those cases.  *Id.* at 287.  Whether exercising this jurisdiction is appropriate must be "informed by the teachings and experience [of the courts] concerning the functions and extent of federal judicial power."  *Id.*  Put another way, "[i]n the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and judicial administration."  *Id.* at 288.

But even where jurisdiction is not discretionary, courts may abstain from exercising jurisdiction under certain circumstances that may intrude on the prerogative of state courts. *See generally Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976); *Younger v. Harris*, 401 U.S. 37 (1971); *La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496 (1941).  Abstention helps avoid duplicative litigation and interference with state-court proceedings.

For similar reasons, in declaratory judgment actions, courts must consider whether "federalism, efficiency, and comity" counsel against exercising jurisdiction when an ongoing proceeding in state court overlaps with the federal case.  *Penn-Am. Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004).  In making this determination, we often look to (1) the state's interest in having its own courts decide the issue; (2) the state courts' ability to resolve the issues more efficiently than the federal courts; (3) the potential for unnecessary entanglement between the state and federal courts based on overlapping issues of fact or law; and (4) whether the federal action is mere forum-shopping.  *See Penn-Am.*

11

*Ins. Co.*, 368 F.3d at 412 (citing *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 376 (4th Cir. 1994), *abrogated in part on other grounds by Wilton*, 515 U.S. 277). And courts should exercise their discretionary jurisdiction with caution when doing so would raise serious questions about Article III jurisdiction, as this case does. *See Edward J. DeBartlo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council*, 485 U.S. 568, 575 (1998).

In deciding whether to exercise the discretion to issue a declaratory judgment, we must look closely at any potentially preclusive consequences that our decision might have on the state-court proceeding, or vice versa. Preclusion following an imprudent federal decision might "frustrate the orderly progress of the state-court proceedings by leaving the state court with some parts of the case foreclosed from further examination but still other parts in need of full scale resolution." *Nautilus*, 15 F.3d at 377 (internal quotation marks omitted). By contrast, letting the state first resolve ambiguities in the record before us may permit us to make a more informed decision than we could do otherwise. *Cf. A/S J. Ludwig Mowinckles Rederi*, 559 F.2d at 932 ("An important factor in considering ripeness is whether resolution of the tendered issue is based upon events or determinations which may not occur as anticipated.").

Trying to resolve Trustgard's responsibility under the surety endorsement now would lead to confusion and unnecessary entanglement with the state-court lawsuit. In their briefs, the parties have focused in large part on legal issues surrounding the interpretation of the surety endorsement. But, at least according to Collins, resolving the applicability of the endorsement also requires us to resolve factual issues about Brown's

12

liability. Other issues before the district court similarly counsel against exercising jurisdiction. Whether Brown's liability policy covered the accident is antecedent to the endorsement, at least in a practical sense: if Brown's liability policy covered the accident, there would be no need to resort to the endorsement. In such a circumstance, the interpretation of the endorsement would be the epitome of an advisory opinion.

As Trustgard acknowledges, the district court was forced to "engag[e] in significant analysis of Appellants' potential state law claims" when deciding this case. Appellee Br. 16. The district court began its analysis by discussing Collins's two potential avenues for imposing liability on Brown, with the first involving the doctrine of respondeat superior. The district court determined that this theory failed on the facts, effectively deciding a factual question at issue in the state proceeding.

This overlap with the state-court proceeding is significant. Both suits involve whether an agency relationship—or some other basis for vicarious liability—exists between Brown and McWilliams. Resolving those issues in a federal venue might have the unfortunate result of precluding the parties from fully litigating them in state court. Meanwhile, the state court, with access to the full transcript and other information, has begun the process of addressing those issues.

We are particularly concerned about the court's entanglement with those state-court issues given how thin and ambiguous the record was at the time of the district court's

13

analysis.[7] The district court relied on the lack of an "owner-operator agreement or lease agreement" between Brown and McWilliams to conclude that there was no agency relationship for respondeat superior liability to apply. J.A. 152; *see also* J.A. 139. But, under South Carolina law, an agency relationship can be established without a written agreement. *See Fernander v. Thigpen*, 293 S.E.2d 424, 426 (S.C. 1982) ("A true agency relationship may be established by showing evidence of apparent or implied authority, even where the parties have entered an agreement to the contrary."). And the Joint Appendix includes a single page of the transcript of McWilliams's deposition from the state suit, in which McWilliams states that he was displaying Brown's motor carrier license because he was "hauling cars for [him] at the time." J.A. 135. While we express no opinion whether it will, this statement, with more context, could conceivably suggest some kind of agency relationship when fully litigated in state court.

The district court not only resolved the nature of the relationship in the context of Brown's insurance policy, but it also extended its reasoning to Brown's surety endorsement. Addressing whether Brown's endorsement was implicated, the district court appeared to conclude that Brown was not a "motor carrier" because he "did not own, operate, maintain or use" a vehicle involved in the accident, he "was not even present during the accident," and he was not a party to "an owner-operator agreement or lease agreement" with McWilliams. J.A. 154–55. But the uncertainty about the relationship

---

[7] During oral argument the parties noted that the federal court record lacked the applicable state-court complaint from 2017.

14

between Brown and McWilliams (and about the theory by which Brown may be liable) renders it particularly unclear who qualified as a "motor carrier." *See* 49 U.S.C. § 13102(14); 49 C.F.R. § 387.29. It could be only one or, at least theoretically, up to three motor carriers (Brown, McWilliams, and Murray).

That left two unappealing options for the district court were it to exercise jurisdiction. The first, which the district court chose, was to rule on the merits using the limited record. As discussed, this option may have a preclusive effect on issues of fact before the state court, which has the more robust record and thus is better equipped to resolve them. The second option, which we could order on a remand, would be to allow for more discovery in federal court to supplement the record.

Yet this second path would lead to a substantial duplication of effort with the state court. As the deposition excerpts in the record show, discovery in state court is already well underway. Making the district court conduct discovery on those same issues would be a waste of everyone's time. Rather than begin duplicative discovery on issues already being addressed in state court, we think it is best for the state court to resolve these questions itself. After that court has a chance to settle these uncertainties, the parties may return, if necessary, to ask a federal court to decide any remaining coverage questions.

In the end, this case involves state-law issues about how to apportion liability following an automobile accident. Considerations of comity and judicial efficiency weigh strongly in favor of permitting the state court to address the relationship among the various defendants. These considerations become overwhelming given the dearth of information available in the federal case. So, while we have no reason to think that Trustgard brought

15

this suit to shop for a friendlier forum, the factual uncertainties in the record before us and the likelihood of entanglement with the state-court lawsuit compel us to dismiss the case.

* * *

We recognize the practical benefits to the parties in the state-court litigation of knowing the extent of the available money to satisfy any judgment. But just because a federal court *could* exercise jurisdiction under the Declaratory Judgment Act does not mean that it *should*. The combination of factors here requires us to find that the district court abused its discretion: without addressing the decision to exercise its discretionary jurisdiction, the court reached the merits despite a thin and ambiguous record. In doing so, the court created both a substantial question about whether Article III jurisdiction existed and a serious potential to interfere with ongoing state proceedings. We therefore vacate the decision and remand with instructions to dismiss the action without prejudice.

*VACATED AND REMANDED*

PAMELA HARRIS, Circuit Judge, concurring in the judgment:

I concur in the majority's holding that the district court abused its discretion under the Declaratory Judgment Act when it assumed jurisdiction over this insurance dispute, and in its judgment vacating the district court's decision on that basis. For the reasons the majority very persuasively sets out in Part II.B of its opinion – including the state-law nature of the issues presented, the potential for interference with state-court proceedings, and the notable thinness of the factual record before the federal court – the district court should have declined to exercise jurisdiction here.

Unlike the majority, however, I see no need to opine on the constitutional status of certain duty-to-indemnify claims or the dangers of advisory opinions. *See* Maj. Op. Part II.A. As the majority explains, it is not necessary that we address Article III standing; though ordinarily we resolve such jurisdictional questions first, that rule does not apply here, where "a discretionary jurisdictional" doctrine is sufficient to dispose of the case. Maj. Op. at 9 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 100 n.3 (1998)). We have the benefit of no briefing or argument on the constitutional issue. And this question, it seems to me, is far from settled.

It is true, as the majority explains, that we, along with some other courts of appeals, have found claims for indemnification "premature" when there has been no "determination of liability," *see A/S J. Ludwig Mowinckles Rederi v. Tidewater Const. Co.*, 559 F.2d 928, 932 (4th Cir. 1977), though we also recognized that the authorities on the issue are "conflicting," *id.* at 931. But none of those cases (and no other court of appeals case that I have found) clearly treat this as a matter of Article III jurisdiction, as opposed to a concern

17

about ripeness in the more prudential sense, and some of the case law makes that distinction explicit. *See*, *e.g.*, *Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003) ("A declaration that A must indemnify B if X comes to pass has an advisory quality; and if the decision would not strictly be an advisory opinion (anathema under Article III) it could be a mistake, because it would consume judicial time in order to produce a decision that may turn out to be irrelevant."). What case law there is on this subject, in other words, is "more a matter of when the court should exercise its discretion to decline jurisdiction, rather than its lack of jurisdiction under principles of justiciability." 16 Couch on Insurance § 227:37 (3d ed. 2019).

My aim here is not to question the direction in which the majority's Article III analysis points. It may be that the courts ultimately will conclude that there is no subject matter jurisdiction over duty-to-indemnity claims absent a finding of liability, and that they will do so under the rubric of standing rather than ripeness, as posited by the majority. But given the lack of clarity in the case law and the absence of any need to address the issue here, I would not wade as far into this constitutional question as the majority has gone.