RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0026p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

PEARLIE SUE GAMBREL, Personal Representative of
the Estate of Jessie J. Mills,

*Plaintiff-Appellant*,

*v.*

KNOX COUNTY, KENTUCKY; MIKEY ASHURST, Officer,
Knox County Sheriff's Department, in his individual
capacity; BRANDON BOLTON, Knox County Constable,
in his individual capacity,

*Defendants-Appellees*.

⎤
⎥
⎥
⎥
⎥
⎥
⎥
⎥   No. 20-6027
⎥
⎥
⎥
⎥
⎥
⎦

─────────────

Appeal from the United States District Court for the Eastern District of Kentucky at London.
No. 6:17-cv-00184—Robert E. Wier, District Judge.

Argued: June 10, 2021

Decided and Filed: February 8, 2022

Before: GIBBONS, KETHLEDGE, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Debra Loevy, LOEVY & LOEVY, Chicago, Illinois, for Appellant. Jason E.
Williams, WILLIAMS & TOWE LAW GROUP, PLLC, London, Kentucky, for Appellees.
**ON BRIEF:** Debra Loevy, Jon Loevy, Elliot Slosar, Amy Robinson Staples, LOEVY &
LOEVY, Chicago, Illinois, for Appellant. Jason E. Williams, WILLIAMS & TOWE LAW
GROUP, PLLC, London, Kentucky, for Appellees.

---

**OPINION**

---

MURPHY, Circuit Judge. In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court disregarded a plaintiff's claim that he had been driving safely during a high-speed chase because the claim was "blatantly contradicted" by objective video evidence showing his dangerous maneuvers. *Id.* at 380. This case requires us to decide how far *Scott* goes in allowing courts at the summary-judgment stage to ignore a plaintiff's evidence about what happened during a police encounter on the ground that the evidence conflicts with the bulk of the summary-judgment record.

Responding to a 911 call, two officers came upon Jessie Mills bizarrely and dangerously carrying his kidnapped daughter down the middle of an unlit road on a dark night. After a struggle, one of the officers shot and killed Mills. The ensuing police investigation initially revealed a largely consistent story from the officers and bystanders: Mills had threatened to harm the officers, fought them with "super-human" strength, and charged at one of them just before the shooting. In this litigation, however, one of the bystanders, Ricky Hobbs, claimed that he had lied to the police during that investigation. He now says that the officers brutally beat Mills even though Mills did not resist, that they could have easily handcuffed him, and that the shooting should not have happened. The officers ask us to disregard Hobbs's testimony because it conflicts with the testimony from several others. But we do not think *Scott* reaches so far. This testimonial dispute instead raises a classic jury question. We thus respectfully disagree with the district court's decision to grant summary judgment to the officers outright. Even accepting Hobbs's testimony, however, the officers are still entitled to qualified immunity with respect to their initial use of force to recover the child, and the relevant local government is entitled to summary judgment on the federal claim against it. We thus affirm in part, reverse in part, and remand for further proceedings.

I

For years, Mills and his ex-wife struggled with drug addictions that led them to neglect their four young children. James and Geneva Helton, the children's maternal grandparents, obtained custody of the children and began raising them at their home in Knox County, Kentucky. Mills would occasionally visit.

Around 10:00 p.m. on June 29, 2016, he showed up unannounced at the Heltons' home. Mrs. Helton let Mills in, but his children were already asleep. Without saying a word, Mills helped himself to a jug of juice and woke up his sons. During the commotion, Mills's two-year-old daughter walked out crying. Mills carried her outside. Mrs. Helton thought that Mills was simply walking her around as he had done on prior visits. On this visit, though, Mills walked to his car. When Mrs. Helton heard his engine start, she alerted her husband. The couple rushed out to stop Mills from leaving; he almost ran them over as he drove off with their granddaughter. The Heltons feared for her safety given Mills's abnormal behavior and the risk that he was on drugs. Mrs. Helton called the police while Mr. Helton jumped in his car to pursue the fleeing Mills.

Mills ran out of gas after only a few miles. He abandoned his vehicle and started walking up the road carrying his daughter. Mr. Helton caught up to Mills just as an acquaintance, Ricky Hobbs, was offering Mills a ride. Helton described the kidnapping to Hobbs and persuaded him not to let Mills in his truck. After parking their vehicles, Helton and Hobbs followed Mills on foot. Mills continued to walk down the middle of an unlit, two-lane road on a dark night. Hobbs and Helton persisted in their pursuit for over a mile, staying about five feet behind Mills. Although Helton tried to convince Mills to return to his home, Mills did not respond. He simply muttered to himself or sang to his daughter. Hobbs flickered his cellphone light to signal the group's presence to oncoming cars. A passerby later began walking with the group and used a flashlight to better divert traffic.

As these events were unfolding, Knox County Sheriff's Deputy Mikey Ashurst and Knox County Constable Brandon Bolton ("the Officers") received a call from dispatch that a male suspect had kidnapped his daughter from the grandparents who had custody of her. The Officers

arrived at the scene to see the passerby directing traffic and Mills walking in the road. They exited their cruiser and ordered Mills to stop, but he ignored their commands. Ashurst caught up with Mills, slapped him on the elbow to get his attention, and asked him to put his daughter down so they could talk. According to Ashurst, Mills responded by saying something like they could pry her out of his "cold, dead hands[.]" Ashurst Dep., R.108-1, PageID 4280. Some witnesses then saw Mills throw a punch; others did not. All agree, however, that the Officers' efforts to recover the child without force had failed. Mills refused to hand her over and quickly moved in the opposite direction.

At this point, two conflicting stories emerge. It is undisputed that Mills fell to the ground. But witnesses differ about how he got there. Under the account told by Hobbs and Helton, one or both of the Officers hit Mills in the back of the head with a flashlight or other dark object. Under a different account—one told by several witnesses, including the Officers—Ashurst discharged his taser's cartridge at Mills's back when Mills got about six feet away. Whatever the cause of Mills's fall, Bolton immediately took the child from him and returned her to Helton.

It is next undisputed that the Officers engaged in a five-minute struggle with Mills that left them covered in his blood. During this altercation, Ashurst twice reactivated his taser (the prongs of which were still in Mills's back) and tased Mills directly in drive-stun mode (how many times he does not recall). Ashurst also struck Mills with a flashlight multiple times, kneed Mills in the face and head, and repeatedly hit Mills with his baton. While Ashurst landed these blows, Bolton struck Mills with a flashlight many times, tased Mills in the neck, and hit Mills with his baton.

What generated this substantial use of force? For a second time, stories diverge. According to Hobbs, the Officers "just kept hitting" Mills even though he was not fighting back. Hobbs Dep., R.108-4, PageID 4400. Hobbs added that the Officers took a break from hitting Mills only because they ran out of breath, at which point Mills was nearly unconscious. During this beating, Hobbs believed, the Officers had "every opportunity" to handcuff Mills. *Id.*, PageID 4425. Several others paint a far different picture. According to the Officers, they commanded Mills (who was twice Bolton's size) to quit resisting, turn onto his stomach, and put

his hands behind his back. But they asserted that he refused and repeatedly kicked and punched them. Other bystanders likewise saw Mills vigorously fighting with the Officers.

All agree that Ashurst next killed Mills by shooting him twice shortly after he got up. For a third time, however, disagreement exists over how this shooting came about. As Hobbs recounted things, the Officers returned from their rest break and brought Mills to his feet by kicking him. Although Ashurst shouted a warning, Hobbs stated that he fired after Mills took just a step or two—at a walking pace—toward him. At the time of the shooting, Hobbs further recalled, Mills had his arm extended toward Ashurst but was looking behind himself in the opposite direction. Mills was at least six to eight feet away.

The Officers view things quite differently. According to them, Mills showed no signs of pain at the end of their struggle. He also said: "When I get up from here, I'm going to hurt you." Ashurst Dep., R.108-1, PageID 4292. As Mills got up, Ashurst switched from his baton to his firearm and backpedaled to put distance between them. Staring at Ashurst with a clenched fist, Mills began toward him. According to Bolton, a running Mills gained ground "very, very fast[]" on a backpedaling Ashurst. Bolton Dep., R.108-3, PageID 4362. Ashurst pointed his gun at Mills and warned that he would shoot if Mills kept approaching. Mills refused to stop, and Ashurst fired two rounds when Mills got within a few feet. Another witness testified that Mills was running toward Ashurst, that he had "backed" Ashurst up "a long ways before the shots were fired," and that Mills was "really close" (perhaps within an arm's reach) when Ashurst shot him. Smith Dep., R.108-7, PageID 4585, 4595–96. Others agreed that Mills had gone after Ashurst at the time of the shooting.

\* \* \*

Pearlie Gambrel, Mills's mother, sued the Officers and Knox County under 42 U.S.C. § 1983 and Kentucky law. As relevant now, she alleged that the Officers unreasonably seized Mills in violation of the Fourth Amendment and sought to hold the County liable for this seizure under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Gambrel also brought state-law claims against the Officers for, among other things, assault and battery and wrongful

death.  She lastly pursued an indemnification claim against the County under a Kentucky law that requires counties to indemnify their employees.

The Officers and Knox County moved for judgment on the pleadings.  The court denied this motion with respect to all claims relevant to this appeal except the indemnification claim. *Gambrel v. Knox County*, 2018 WL 1457296, at *4–13 (E.D. Ky. Mar. 23, 2018).  The court granted judgment to the County on that claim, reasoning that the state law permitted only employees (not the plaintiffs who sue them) to enforce its indemnification provisions against their county employers.  *See id.* at *15.

After discovery, the district court granted summary judgment to the Officers and County. *Gambrel v. Knox County*, 476 F. Supp. 3d 580, 604 (E.D. Ky. 2020).  The court held that the Officers were entitled to qualified immunity on Gambrel's Fourth Amendment claim.  *Id.* at 590–99.  It next rejected the *Monell* claim because Gambrel failed to show that the County deficiently trained or inadequately supervised the Officers.  *Id.* at 600–02.  The court lastly declined to exercise supplemental jurisdiction over the remaining state-law claims.  *Id.* at 602–03.

II

On appeal, Gambrel argues that the district court erred by granting summary judgment to the Officers on her Fourth Amendment claim, granting summary judgment to the County on her *Monell* claim, and dismissing her state-law claims.  We review the court's summary-judgment decision de novo.  *See Barton v. Martin*, 949 F.3d 938, 946 (6th Cir. 2020).

A.  Fourth Amendment Claim against the Officers

Gambrel alleges that the Officers violated the Fourth Amendment during their encounter with Mills, but the Officers respond that qualified immunity bars her damages claim.  To overcome this qualified-immunity defense, Gambrel must prove two things.  *See District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  She first must prove that the Officers' use of force violated the Fourth Amendment.  She then must prove that our cases clearly established the unconstitutional nature of this force at the time that the Officers acted.  *See, e.g.*, *Rivas-Villegas*

*v. Cortesluna*, 142 S. Ct. 4, 7 (2021) (per curiam); *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam).

When analyzing the first (constitutional) question, the Supreme Court has held that otherwise valid "seizures" can become "unreasonable" under the Fourth Amendment if officers use excessive force to carry them out. *See Graham v. Connor*, 490 U.S. 386, 394–97 (1989). To decide whether force was excessive, the Court balances the government's interest in preventing crime and protecting the public and the officers against a suspect's interest in avoiding injury. *See Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985). The Court looks to all of the circumstances when deciding how this balancing plays out for a particular use of force. *Graham*, 490 U.S. at 396. To help guide this totality-of-the-circumstances test, it has highlighted three recurring factors: whether the officers were investigating a serious crime; whether the suspect posed a safety threat; and whether the suspect was resisting arrest. *See id.* We consider these factors from the perspective of reasonable officers who typically must decide on the level of force to use within seconds, not the perspective of judges who have weeks to pore over every record fact. *See id.* at 396–97.

When analyzing the second (qualified immunity) question, the Supreme Court has held that plaintiffs cannot hold officers liable unless the relevant caselaw gave the officers "fair notice" that their force was unconstitutional. *Rivas-Villegas*, 142 S. Ct. at 7. A case can provide the required notice only if it "clearly established" that the force was excessive, placing the issue "beyond debate" and making the officers "plainly incompetent" in thinking otherwise. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citations omitted). To satisfy this standard in the fact-intensive excessive-force context, plaintiffs must define with specificity the clearly established legal rule that the officers allegedly violated. *See Rivas-Villegas*, 142 S. Ct. at 8. Except in "obvious" cases, the general legal rule from *Graham* (that officers cannot use excessive force) will not clearly show that a specific use of force was unconstitutional. *Id.* A plaintiff instead must "identify a case" that found a constitutional violation based on sufficiently similar facts. *Id.*

These two issues (whether the use of force was excessive and whether our cases clearly established its unconstitutionality) are legal questions suitable for resolution on summary

judgment. *See Beck v. Hamblen County*, 969 F.3d 592, 604 (6th Cir. 2020); *Stricker v. Township of Cambridge*, 710 F.3d 350, 364 (6th Cir. 2013). Yet the qualified-immunity defense does not change the normal summary-judgment rules. *See Tolan*, 572 U.S. at 656–57. So when deciding whether force was excessive or whether our precedent clearly established that result, we must view genuine factual disagreements in the light most favorable to the plaintiff. *See id.* If a reasonable jury could credit the plaintiff's version of events and if that version clearly shows the excessive nature of the defendants' force, we cannot grant the officers summary judgment. *See Bletz v. Gribble*, 641 F.3d 743, 749 (6th Cir. 2011); *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998).

In this case, Gambrel asserts that the Officers used excessive force three times: (1) when they hit Mills to recover his child; (2) when they struggled with Mills while allegedly attempting to arrest him; and (3) when Ashurst shot him. We must evaluate the legality of each use of force at the moment that the Officers engaged in it. *See County of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1547 (2017); *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007). Because § 1983 does not impose vicarious liability on one Officer for the other's actions, we also must look to each Officer's personal actions to assess his individual right to qualified immunity. *Beck*, 969 F.3d at 600. We will undertake this officer-specific approach for the three uses of force.

### 1. The Initial Use of Force

We begin with the first use of force designed to recover Mills's daughter. Under the Officers' version of events, Ashurst tased Mills in the back; under Gambrel's version, Ashurst and perhaps Bolton hit Mills in the back of the head with a flashlight or similar blunt object. Because we must view the facts in the light most favorable to Gambrel, *see Tolan*, 572 U.S. at 656–57, we must assume that the Officers took the more forceful action.

Which one is that? We have generally treated batons (which are similar to flashlights) and tasers as non-lethal weapons. *See Davis v. Agosto*, 89 F. App'x 523, 526 (6th Cir. 2004) (batons); *Rucinski v. County of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2016) (tasers). But we have added that a strike with a hard object has the "potential" to qualify as "deadly force," especially if an officer hits a suspect in the head. *Robinette v. Barnes*, 854 F.2d 909, 912

(6th Cir. 1988); *Howser v. Anderson*, 150 F. App'x 533, 538 (6th Cir. 2005); *cf. Davenport v. Causey*, 521 F.3d 544, 552–53 (6th Cir. 2008); *Baker v. City of Hamilton*, 471 F.3d 601, 609 (6th Cir. 2006). Gambrel thus treats the blow to Mills's head as the more serious use of force, and we may assume the point on appeal. Because a witness suggested that Ashurst and Bolton both hit Mills, this view of the record also implicates both Officers.

Even so, our caselaw did not clearly establish that the Officers acted unconstitutionally when using this force. Since we may address the two-part qualified-immunity test in either order, s*ee Pearson v. Callahan*, 555 U.S. 223, 236 (2009), we can begin and end our analysis with the requirement that Gambrel identify clearly established law. To attempt to do so, she cites cases holding that "a totally gratuitous blow with a policeman's nightstick may cross the constitutional line." *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988); *see, e.g.*, *Baker*, 471 F.3d at 609; *Phelps v. Coy*, 286 F.3d 295, 301–02 (6th Cir. 2002). And she cites cases finding that the use of force was excessive when a suspect did not pose a safety threat. *See, e.g.*, *Wright v. City of Euclid*, 962 F.3d 852, 867 (6th Cir. 2020); *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013).

Yet the facts of none of these cases come close to resembling the facts that the Officers confronted when they arrived on the scene here. Unlike, say, a man sitting in a car during an investigatory traffic stop, *see Wright*, 962 F.3d at 866–67, or a man who had signaled his acquiescence to an officer's orders, *see Baker*, 471 F.3d at 609, the Officers confronted a far different suspect. A seemingly unstable man was dangerously carrying his kidnapped daughter down the middle of a dark road as cars sped by. This man also rebuffed the Officers' commands to stop and release the child. Gambrel has failed to "identify a case" with "sufficiently similar" facts that would have put the Officers on notice that they could not hit Mills to quickly rescue the child from this dangerous situation. *Rivas-Villegas*, 142 S. Ct. at 8–9. Gambrel has thus failed to demonstrate that their alleged strikes violated clearly established law. *See id.* at 7–9.

The Supreme Court's three factors for assessing the reasonableness of an officer's use of force confirm this point. Consider, first, the severity of Mills's crime. *See Graham*, 490 U.S. at 396. The Officers had probable cause to believe that he had kidnapped his daughter, no doubt a serious felony. *See* Ky. Rev. Stat. § 509.040(1)(f), (2). Consider, second, that the Officers could

reasonably believe that Mills was putting his daughter's life at risk. *See Graham*, 490 U.S. at 396. He was carrying her in an obviously unsafe location. *Cf. Williams v. Sandel*, 433 F. App'x 353, 354, 361 (6th Cir. 2011). He was also engaging in bizarre, unpredictable behavior potentially caused by his drug use. Mills, for example, was talking incoherently—as if he were "speaking in tongues"—when the Officers arrived. Bolton Dep., R.108-3, PageID 4355. Even Hobbs, Gambrel's strongest witness, described Mills as "out of his mind." Hobbs Dep., R.108-4, PageID 4414. Consider, third, that Mills resisted arrest. *See Graham*, 490 U.S. at 396. He refused to comply with the Officers' commands to stop and fled in the other direction. All told, these factors might suggest that the Officers used reasonable force to recover the child. But we need not decide the point. At a minimum, a reasonable officer could believe that this initial use of force was reasonable. *See Rivas-Villegas*, 142 S. Ct. at 7. Even under Gambrel's version of the facts, then, the Officers are entitled to qualified immunity at this first stage of the encounter.

### 2. The Five-Minute Struggle

We next turn to the second use of force when the Officers struggled with Mills for five minutes. During the struggle, Ashurst tased Mills many times, repeatedly hit him with a flashlight and baton, and kneed him in the head and face. Bolton also struck Mills with a flashlight and baton and tased Mills in the neck. Should this use of force lead to a different result than the first one? We think so—but only when accepting Gambrel's version of events.

Under the Fourth Amendment, if officers have the right to arrest a suspect for committing a crime (as the Officers did in this case), they may use some force to carry out the arrest. *See Graham*, 490 U.S. at 396. An arrestee's resistance to the arrest can also justify significant physical force in response. *See, e.g.*, *Earnest v. Genessee County*, 841 F. App'x 957, 960–61 (6th Cir. 2021) (takedown maneuver); *Rudlaff v. Gillispie*, 791 F.3d 638, 641–42 (6th Cir. 2015) (knee strike and taser use); *Jones v. City of Cincinnati*, 736 F.3d 688, 695 (6th Cir. 2012) (baton strikes); *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012) (taser use). To list one example, officers reasonably used baton strikes, pepper spray, and 37 taser activations when arresting a mentally unstable suspect who attempted to evade arrest by dangerously running around a busy freeway. *See Williams*, 433 F. App'x at 356–57, 362–63.

At the same time, the Fourth Amendment prohibits officers from using "gratuitous" force that is unnecessary to effectuate the arrest of a person who has ceased resisting. *Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006). In one case, for instance, an officer acted unreasonably when he allegedly hit an arrestee with a baton as the arrestee approached with hands raised. *Baker*, 471 F.3d at 607. In another, an officer acted unreasonably when he allegedly slammed a cooperating arrestee against a cupboard and tossed him down a small set of stairs. *Barton*, 949 F.3d at 952–54; *see also, e.g.*, *Malory v. Whiting*, 489 F. App'x 78, 84 (6th Cir. 2012) (beating); *Landis v. Baker*, 297 F. App'x 453, 461 (6th Cir. 2008) (ten baton strikes and four uses of taser); *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513–14 (6th Cir. 2006) (slap to face); *Phelps*, 286 F.3d at 297, 301–02 (beating); *McDowell*, 863 F.2d at 1307 (baton strike).

Does the Officers' use of force against Mills fall on the legal or illegal side of this divide? Under the Officers' version of the facts, their force was plainly reasonable. According to them, when they attempted to handcuff Mills, he disobeyed repeated commands to roll over and instead kicked and punched them, bit Bolton, and grabbed Ashurst by the legs to knock him to the ground. Several witnesses corroborated their account. One bystander described Mills's "super-human" ability to "wear[] the ground out with two grown men" as "unreal," adding that Mills "literally whooped both" Officers and that "they were trying to get away from him." Smith Dep., R.108-7, PageID 4588, 4594. Even Hobbs claimed in his initial police interview that Mills was "fighting all the time" while on the ground. Hobbs Int., R.85-2, PageID 1691–92. Such violent resistance to the arrest would justify the Officers' significant force in response. *Cf. Jones*, 736 F.3d at 695.

The problem for the Officers? Hobbs's later deposition testimony. This testimony paints a clear picture of wanton violence on the Officers' part. Hobbs testified that they "repeatedly just kept hitting [Mills]" even though he was "not fighting" back. Hobbs Dep., R.108-4, PageID 4400, 4414. During the beating, the Officers had "every opportunity in the world to handcuff" Mills. *Id.*, PageID 4425. According to Hobbs, "[t]hey could have handcuffed him at any time while he was laying down there and both of them on him instead of beating him and getting back up off the top of him." *Id.*, PageID 4402. Hobbs also asserted that Mills's lack of cooperation

resulted from the Officers' own misconduct. He claimed that Mills gave "one little kick" against the Officers merely to defend himself from the onslaught. *Id.*, PageID 4415. And while Hobbs conceded that Mills did not comply with commands to get on his stomach, he said that Mills failed to do so to protect himself. Hobbs added that the Officers stopped hitting Mills only because "they both lost their breath," at which point Mills was "knocked about out." *Id.*, PageID 4400–01. If a jury credited this account, it would show the type of "gratuitous" violence that runs afoul of the Fourth Amendment. *Shreve*, 453 F.3d at 688.

Having found a constitutional violation under Gambrel's version of events, we next must ask whether our caselaw clearly established that this alleged beating would violate the Fourth Amendment when the Officers purportedly inflicted it in June 2016. The clear answer is yes. Well before then, our precedent had "clearly establish[ed] the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Shreve*, 453 F.3d at 688; *see, e.g.*, *Phelps*, 286 F.3d at 301–02. Under the Supreme Court's framework, this legal rule is identified at a sufficiently "specific" level of generality to qualify as clearly established law in this case. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (citation omitted). For one thing, "the unlawfulness" of the Officers' alleged beating (as recounted by Hobbs) would "follow immediately from the conclusion that [the rule] was firmly established." *Wesby*, 138 S. Ct. at 590 (citation omitted).

For another, Mills has "identif[ied] a case"—*Shreve*—with "materially" indistinguishable facts. *Rivas-Villegas*, 142 S. Ct. at 8. In that case, officers broke open the front door of Lori Shreve's house to arrest her on an outstanding warrant. *See* 453 F.3d at 683. Finding Shreve hiding in a closet, they pepper sprayed her. *Id.* at 684. Shreve claimed that the officers went on to gratuitously beat her for minutes after they had neutralized her with this pepper spray. *Id.* at 687. We held that the alleged beating would have violated Shreve's clearly established rights if she could prove it to a jury. *Id.* at 686–88. Gambrel asserts the same type of claim. She alleges that the Officers gratuitously beat Mills even though, according to Hobbs, he was not fighting back and could have been handcuffed at any time. For this second use of force, then, the Officers' right to qualified immunity hinges on the "view of the facts" that the jury accepts.

*Bouggess*, 482 F.3d at 896 (citation omitted). That makes summary judgment improper. *Bletz*, 641 F.3d at 749.

In response, the Officers do not contest our view of the *law*: that an unnecessary beating would have violated Mills's clearly established rights. They instead contest our view of the *facts*: that Hobbs's testimony would allow a jury to find such a beating. Relying on *Scott v. Harris*, 550 U.S. 372 (2007), the Officers ask us to ignore his testimony on the ground that it is "blatantly contradicted" by the rest of the record. *Id.* at 380. The Officers are correct that they will have plenty of evidence with which to impeach Hobbs. Their testimony—not to mention the testimony of other bystanders—starkly conflicts with the account Hobbs gave at his deposition. In his night-of-the-shooting interview, moreover, Hobbs himself corroborated the account told by the other witnesses. At the deposition, however, Hobbs changed his story and suggested that he had lied to the police during their investigation because he was afraid of them.

Yet simply because Gambrel might find it difficult to convince a jury to believe Hobbs does not allow us to ignore his testimony now. *See* 10A Charles A. Wright et al., *Federal Practice and Procedure* § 2725.2, at 440 (4th ed. 2016). Under the Supreme Court's summary-judgment rules, we must "believe[]" the nonmoving party's "evidence" at this stage, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and "disregard" the moving party's conflicting evidence "that the jury is not required to believe," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). When witnesses tell differing stories, therefore, we cannot credit the story of the witness that we find more believable. *See Anderson*, 477 U.S. at 255. That is the jury's job. We instead must resolve evidentiary disputes over specific historical facts—such as whether Mills fought with the Officers—in favor of Gambrel. *See Tolan*, 572 U.S. at 656–57. (The Officers make no claim that Hobbs's previous statement to police *before* this litigation began implicates our sham-affidavit rule, which sometimes bars deponents from changing their stories in later-filed affidavits. *See Reich v. City of Elizabethtown*, 945 F.3d 968, 976–77 (6th Cir. 2019).)

*Shreve* confirms our conclusion. There, the officers' evidence about what happened was "significantly stronger" than Shreve's. 453 F.3d at 687. Everyone but Shreve testified "consistently" that the officers did not beat her, and Shreve herself gave inconsistent testimony

about the events. *Id.* at 687–88. But we credited her testimony at the summary-judgment stage. *Id.* at 688. As in *Shreve*, it "is ultimately up to the jury to believe [Hobbs] or not"; it is not our right to disbelieve him now. *Id.*

*Scott* does not change things. There, a § 1983 plaintiff claimed that he had been driving safely during a high-speed chase when an officer used his cruiser to ram the plaintiff's car off the road, which rendered the plaintiff a quadriplegic. 550 U.S. at 375, 379. But a video of the plaintiff's driving showed a "Hollywood-style car chase of the most frightening sort[.]" *Id.* at 380. The Supreme Court held that the plaintiff's description was "blatantly contradicted" by this objective evidence, such that "no reasonable jury could have believed him." *Id.* It thus refused to credit his telling when considering the officer's entitlement to summary judgment. *Id.*

Circuit courts have debated *Scott*'s scope. Is it limited to situations in which a witness's testimony blatantly contradicts unchallenged video evidence? *Cf. Harris v. Pittman*, 927 F.3d 266, 275–76 (4th Cir. 2019); *Darden v. City of Fort Worth*, 880 F.3d 722, 729–30 (5th Cir. 2018). Or is it a specific application of a general rule that allows courts to disregard "incredible" testimony on the ground that the testimony does not create a "genuine" dispute of material fact under Federal Rule of Civil Procedure 56? *Cf. Robinson v. Pezzat*, 818 F.3d 1, 10 (D.C. Cir. 2016); *Morton v. Kirkwood*, 707 F.3d 1276, 1284–85 (11th Cir. 2013); 10A Wright, et al., *supra*, § 2727.2, at 521.

We need not enter this debate. Even under the broader view of *Scott*, Hobbs's deposition testimony is not so "inherently incredible" as to allow us to disregard it now. *Morton*, 707 F.3d at 1284 (citation omitted); *see Robinson*, 818 F.3d at 10–11. Hobbs seemingly is a disinterested witness. And his testimony does not conflict with objective (and indisputably authentic) evidence like a video or audio recording; it conflicts with other witnesses' testimony. The Officers identify no case that has allowed courts to reject one person's sworn testimony as "incredible" simply because other witnesses had a different recollection. In addition, some circumstantial evidence supports Hobbs's revised account. The Officers testified that they suffered no physical injuries during the confrontation, save a knot on Ashurst's leg. They also had only Mills's blood (none of their own) on their clothes. In short, this factual dispute about what happened is for the jury at trial—not for us at summary judgment.

3.  The Fatal Shooting

That leaves the final use of force: the fatal shooting of Mills.  Because only Ashurst shot at Mills, Gambrel makes no attempt to hold Bolton liable for this shooting.  *Cf. Pineda v. Hamilton County*, 977 F.3d 483, 493 (6th Cir. 2020).  Bolton thus is entitled to summary judgment regarding this third use of force, and we apply qualified immunity's two-part test only for Ashurst.

The Supreme Court has established special Fourth Amendment rules for deadly force like the use of a firearm.  Officers may use that force only if they have probable cause to believe that a suspect poses a risk of "serious physical harm" to the officers or others.  *Garner*, 471 U.S. at 11; *see Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019).  In countless cases applying this test, we have found that officers had the probable cause that made their shooting lawful when they could reasonably conclude that a suspect might fire a gun at them or use another dangerous weapon against them (even if they turned out to be wrong).  *See, e.g.*, *Jordan v. Howard*, 987 F.3d 537, 543–44 (6th Cir. 2021); *Williams v. City of Chattanooga*, 772 F. App'x 277, 280–81 (6th Cir. 2019); *Reich*, 945 F.3d at 979–82; *Rush v. City of Lansing*, 644 F. App'x 415, 423–24 (6th Cir. 2016); *Mullins v. Cyranek*, 805 F.3d 760, 765–69 (6th Cir. 2015); *Savage v. City of Memphis*, 620 F. App'x 425, 427–28 (6th Cir. 2015); *Krause v. Jones*, 765 F.3d 675, 680 (6th Cir. 2014); *Chappell v. City of Cleveland*, 585 F.3d 901, 910–11 (6th Cir. 2009).  But suspects need not be armed to justify an officer's decision to fire a weapon.  *See Jacobs*, 915 F.3d at 1040; *Davenport v. Causey*, 521 F.3d 544, 552–54 (6th Cir. 2008).  After a high-speed chase, for example, an officer reasonably shot an unarmed suspect who charged at the officer and disobeyed his repeated commands to stop.  *See Mitchell v. Schlabach*, 864 F.3d 416, 419–20, 421–22 (6th Cir. 2017).

We have, by contrast, held that "an unarmed and nondangerous suspect has a constitutional right not to be shot by police officers."  *Floyd v. City of Detroit*, 518 F.3d 398, 407 (6th Cir. 2008); *cf. Carden v. City of Knoxville*, 699 F. App'x 495, 499 (6th Cir. 2017).  Officers violated this rule when they used deadly force on the unreasonable belief that a suspect had a weapon.  *See Floyd*, 518 F.3d at 407–08; *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005); *see also Withers v. City of Cleveland*, 640 F. App'x 416, 420–22 (6th Cir. 2016).  And officers

violated this rule when they shot a mentally unstable suspect with a knife on the unreasonable belief that this suspect posed a threat to anyone other than himself. *See Studdard v. Shelby County*, 934 F.3d 478, 480–82 (6th Cir. 2019); *see also Sova*, 142 F.3d at 901, 903.

As with the Officers' second use of force, the reasonableness of Ashurst's shooting of Mills under these legal rules depends on the historical facts that the jury believes. Under one version—set out by the Officers and some bystanders—Ashurst's actions were plainly reasonable. On this account, Mills had just battled aggressively with the Officers as they tried (but failed) to arrest him. He then threatened the Officers that he was going to "hurt" them after he got off the ground. Ashurst Dep., R.108-1, PageID 4293. When Mills did so, he quickly charged at a backpedaling Ashurst. Ashurst repeatedly warned Mills to stop or he would shoot and did not fire until Mills made it within an arm's reach. Given the ferocity that Mills had showed during the encounter and the threat that he had made (on the Officers' account), any reasonable officer would have decided to use deadly force to subdue the charging Mills despite his lack of a weapon. *See Mitchell*, 864 F.3d at 421–22; *Davenport*, 521 F.3d at 552–53.

Again, however, that is not the account that we must accept at this stage. Under Hobbs's version of events, we cannot say that Ashurst acted reasonably. According to that version, the Officers had just brutally beaten a nonfighting Mills even though they could have handcuffed him at any time while he remained on the ground. Hobbs also indicated that, for some unknown reason, the Officers "riled" a nearly unconscious Mills "up" by standing over him and kicking him. Hobbs Dep., R.108-4, PageID 4423–24. After he got up, the unarmed Mills took only a step or two toward Ashurst at a walking pace when Ashurst fired. Although Ashurst shouted a warning, he waited only a second to fire. At that moment, Mills was not even looking at Ashurst and was six to eight feet or more away. Accepting these alleged historical facts at this stage, they show that Ashurst shot a mentally unstable yet otherwise "unarmed and nondangerous" arrestee. *Floyd*, 518 F.3d at 407. The Fourth Amendment would bar that type of deadly force against that type of suspect. *Id.*; *see Studdard*, 934 F.3d at 481–82.

This conclusion leads to the second qualified-immunity question: Even under Gambrel's version of events, would Ashurst's shooting violate clearly established law? At times, we have recited the clearly established law in this context at a high level of generality, saying things like

"[i]t has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *Jacobs*, 915 F.3d at 1040 (citation omitted). Yet the Supreme Court recently reaffirmed that, except in "obvious" cases, this general rule (which merely repackages *Garner*'s deadly force test) does not provide sufficient notice to officers about specific uses of deadly force. *See Rivas-Villegas*, 142 S. Ct. at 8 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)); *Stewart v. City of Euclid*, 970 F.3d 667, 675 (6th Cir. 2020). A plaintiff in a nonobvious case must instead identify the legal rule that an officer violated "with more specificity" than *Garner*'s test. *Nelson v. City of Battle Creek*, 802 F. App'x 983, 987 (6th Cir. 2020); *cf. City of Tahlequah v. Bond*, 142 S. Ct. 9, 11–12 (2021) (per curiam).

Under Hobbs's telling of gratuitous police violence, this case nevertheless may well be an "obvious" one in which *Garner*'s general rule provided sufficient notice. *See Sample*, 409 F.3d at 699. But we need not decide the point because our decision in *Sova* provided sufficiently specific notice that Ashurst should not have shot Mills on Hobbs's alleged facts. *See* 142 F.3d at 900–03. In that case, Thomas Sova, a suicidal and intoxicated man, had been cutting himself with butcher knives in his parents' home. *Id.* at 900. After the police arrived, Sova yelled at them to leave and told them that he wanted them to shoot him. *Id.* at 900–01. The officers warned him from outside the home to drop the knives. *Id.* at 901. Yet he walked out the back door with knives in hand, forcing an officer to mace him. *Id.* The agitated Sova returned inside the home and began harming himself again. When he walked out toward the officers a second time, the officers shot and killed him. *Id.* Contrary to the officers' claim that Sova charged at them with knives this second time, his parents alleged that he was shot before he had even taken a step out the door. *Id.* at 902. We held that the Fourth Amendment barred the shooting under their version of events. *Id.* at 903.

This case and *Sova* "warrant the same outcome." *Studdard*, 934 F.3d at 481. If anything, this case is "materially distinguishable" from *Sova* in a way that helps Gambrel more than Ashurst. *Rivas-Villegas*, 142 S. Ct. at 8. Unlike in that case, Ashurst has never even claimed that he thought that Mills had a weapon. As with the Officers' second use of force, then,

Ashurst's entitlement to qualified immunity for the shooting turns on the "version of the facts" that the jury accepts, making summary judgment improper. *See Sova*, 142 F.3d at 903.

## B.  Claim Against Knox County

Gambrel also seeks damages from Knox County, contending that the County's failure to properly train and supervise Ashurst caused the Officers' allegedly unconstitutional use of force. But she has identified no pattern of similar misconduct by Knox County deputies, so she must rely on the rare "single-incident" theory of municipal liability for this failure-to-train claim.  And while Hobbs's telling of a brutal beating and shooting saved Gambrel's claims against the Officers, that same story forecloses her claim against the County.  Given the obviously improper nature of the conduct that Hobbs alleges, Gambrel cannot show that the County should have known that it needed to provide training to guard against the alleged misconduct or that the lack of training caused it.  She thus cannot meet the "rigorous standards of culpability and causation" that govern her claim. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997).

1

Section 1983 does not permit plaintiffs to hold local governments automatically liable for the injuries that their agents cause; plaintiffs can hold those governments liable "only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citation omitted); *see City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  When a municipal employee harms a private party, therefore, that party must connect the employee's conduct to a municipal "policy" or "custom." *See Brown*, 520 U.S. at 403.  Plaintiffs may show the required policy or custom in various ways. Most obviously, municipalities might have official policies that condone excessive force. *See Garner v. Memphis Police Dep't*, 8 F.3d 358, 364–65 (6th Cir. 1993).  Typically, though, they will not have such illegal policies.  If they do not, plaintiffs can still seek to establish that a municipality followed an unofficial custom of inadequately training or supervising the employees who caused the harm. *See Connick*, 563 U.S. at 61.  That said, to ensure that these failure-to-train or failure-to-supervise claims do not transform § 1983 into a vicarious-liability statute, the Supreme Court has required plaintiffs to prove two demanding elements. *See Brown*, 520 U.S. at 405.

*First*, a municipality must have acted with "deliberate indifference" to the fact that its inadequate training or supervision would lead its agents to violate constitutional rights. *Id.* at 407 (quoting *Canton*, 489 U.S. at 388). To show this deliberate indifference, a plaintiff must prove that the violation of a clearly established right was a "known or obvious consequence" of the lack of training or supervision. *Connick*, 563 U.S. at 61 (quoting *Brown*, 520 U.S. at 410); *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 995 (6th Cir. 2017). This standard usually requires proof that a municipality's employees engaged in a "pattern of similar constitutional violations" separate from the conduct that harmed the plaintiff. *Connick*, 563 U.S. at 62. In a "narrow range of circumstances," however, the Supreme Court has left open the possibility that a plaintiff might prove deliberate indifference using only the single instance of unconstitutional conduct against the plaintiff. *Id.* at 63. If the need for a certain type of training is sufficiently "obvious," the Court reasoned, the failure to provide the obviously needed training "could properly be characterized as 'deliberate indifference' to constitutional rights." *Canton*, 489 U.S. at 390 n.10. As an example, it suggested that the failure to provide any training about *Garner*'s "limitations on the use of deadly force" could meet this test because municipalities know that officers with firearms must sometimes attempt to arrest fleeing suspects. *Id.*

*Second*, a municipality's improper training or supervision must have "actually caused" the plaintiff's injury. *Connick*, 563 U.S. at 70. This element requires proof of the two types of causation from the common law of torts: but-for (or factual) causation and proximate causation. *See Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 608–11 (6th Cir. 2007). Even if a municipal employee uses excessive force to harm a plaintiff, then, the plaintiff cannot hold the municipality liable without proof that proper training would have prevented this force. *See Carey v. Helton*, 70 F. App'x 291, 294–95 (6th Cir. 2003) (per curiam). And even if a plaintiff can establish this factual causation, the plaintiff still must show proximate causation—which requires, for example, that a municipality could reasonably foresee that an employee's wrongful act would follow from the lack of training. *See Crabbs v. Scott*, 800 F. App'x 332, 338 (6th Cir. 2020).

2

Before applying these elements here, we start with two points of agreement from the parties about the nature of Gambrel's claim. To begin with, Gambrel does not allege that the Knox County Sheriff's Office had an official policy condoning excessive force. Its use-of-force policy in June 2016 tracked Kentucky's use-of-force standards, which Gambrel does not challenge. *See* Ky. Rev. Stat. §§ 503.050, .070, .090. Gambrel thus agrees that she must prove the "most tenuous" of claims against a local government—that Knox County failed to properly train or supervise its agents about the proper uses of force. *Connick*, 563 U.S. at 61.

Next, Gambrel does not dispute the County's argument that she can hold it liable only for the allegedly inadequate training or supervision of Ashurst (a deputy in the Knox County Sheriff's Office), not Bolton (the Knox County Constable). According to Knox County, Bolton is an agent of Kentucky rather than the County. The Kentucky Constitution creates the office of county constable as an (unpaid) elected position, Ky. Const. § 99, and Kentucky law permits constables to execute warrants and carry concealed firearms, Ky. Rev. Stat. §§ 70.350(1); 527.020(2). Perhaps given their limited roles, Kentucky also exempts constables from the training duties it imposes on other officers. *Id.* § 15.380(5)(c). The County thus argues that it had no power to train or supervise Bolton, and he received no training on his own. Under the relevant caselaw, whether Bolton qualified as an agent of Kentucky or Knox County raises a complex question. *Compare Manders v. Lee*, 338 F.3d 1304, 1328–29 (11th Cir. 2003) (en banc), *with Crabbs v. Scott*, 786 F.3d 426, 429–30 (6th Cir. 2015). Because Gambrel does not dispute the County's claim that Bolton is not its agent, though, we need not consider that question. Instead, Gambrel seeks to hold Knox County liable for Bolton's conduct on the theory that it should have trained *Ashurst* not to allow Bolton (a constable untrained on the use of force) to ride with him.

We thus must consider Ashurst's training. According to him, Knox County did not provide any use-of-force training on its own. The County instead relied on the training that Ashurst took to become a certified peace officer at the police academy run by the Kentucky Department of Criminal Justice Training. *See* Ky. Rev. Stat. § 15.404. At the academy, Ashurst received 18 weeks of training on courses ranging from the use of firearms to the legal rules

relevant to police. His training covered, for example, the proper use-of-force continuum that officers should follow when they confront people showing signs of mental incapacitation due to drug use. Apart from this academy training, Ashurst also took separate training to become the certified firearms instructor for the Knox County Sheriff's Office, which required him to attend an additional two-week course on firearms. Lastly, all peace officers must take 40 hours of annual "in-service training at the Department of Criminal Justice Training" to remain certified. Smith Dep., R.108-17, PageID 4878; *see* Ky. Rev. Stat. § 15.404(2)(a).

Did this training suffice? We need not decide whether Knox County's heavy reliance on Ashurst's academy training was reasonable or instead showed a level of negligence. *See Troutman v. Louisville Metro Dep't of Corrs.*, 979 F.3d 472, 490 & 491 n.14 (6th Cir. 2020). At the least, Gambrel has not produced enough evidence for a reasonable jury to find the deliberate-indifference and causation elements that the Supreme Court has adopted to prevent § 1983 from becoming a vicarious-liability statute. *See Brown*, 520 U.S. at 405. Hobbs's allegations that Ashurst gratuitously beat and shot Mills (and allowed Bolton to engage in similar misconduct) foreclose her claim against Knox County under these two "rigorous" legal elements. *Id.*

Start with deliberate indifference. Gambrel has not identified a "pattern" of excessive force by Knox County agents. *Connick*, 563 U.S. at 62; *cf. Justiniano v. Walker*, 986 F.3d 11, 22–23 (1st Cir. 2021). She thus must establish the County's deliberate indifference under the seemingly "rare" single-incident theory. *Connick*, 563 U.S. at 64. Yet it would not have been "obvious" to Knox County that it needed to instruct a certified peace officer like Ashurst not to engage in (or permit Bolton to engage in) the gratuitous violence that Hobbs alleges. *Canton*, 489 U.S. at 390 n.10. Hobbs's deposition testimony does not suggest that Ashurst and Bolton used a level of force that falls within an "ambiguous 'gray area[]'" about which officers would obviously need training to differentiate lawful from unlawful conduct. *Waller v. City & County of Denver*, 932 F.3d 1277, 1288 (10th Cir. 2019). Rather, he testified that Ashurst and Bolton gratuitously beat Mills and that Ashurst later shot him for no reason. "Even an untrained" officer—let alone one trained at the academy—would know that wanton violence "was inappropriate." *Id.* Because the need for training against this allegedly intentional misconduct was not "obvious," Gambrel cannot prove deliberate indifference through a single misdeed

alone. *Flores v. County of Los Angeles*, 758 F.3d 1154, 1160 (9th Cir. 2014) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1077 (8th Cir. 1996)).

Turn to causation. Gambrel likewise points to no evidence suggesting that if Knox County had provided additional training about avoiding gratuitous violence, the training "would have prevented" the assault on Mills that Hobbs describes. *Id.*; *see Carey*, 70 F. App'x at 294–95. Indeed, neither Ashurst nor Bolton so much as hinted that they believed that the unnecessary force recounted by Hobbs would have been an acceptable way to arrest Mills. To the contrary, Ashurst specifically testified that he needed to follow the "use of force continuum" that he learned at the academy. Ashurst Dep., R.108-1, PageID 4264. So if he engaged in the conduct that Hobbs describes, it would not have been due to the absence of training. It would have been due to the "intentional disregard" of that training. *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 130 (2d Cir. 2004) (Sotomayor, J.); *see also Carr v. Castle*, 337 F.3d 1221, 1232 (10th Cir. 2003).

A large body of precedent supports our conclusion. The deliberate-indifference and causation elements regularly foreclose failure-to-train claims against municipalities when rogue employees engage in blatant wrongdoing (say, a sexual assault of an inmate or a gratuitous beating of a detainee). *See, e.g.*, *Waller*, 932 F.3d at 1285–89; *Flores*, 758 F.3d at 1160. Courts have rejected the "single-incident" theory of deliberate indifference for this misconduct and instead have required proof that a municipality's employees engaged in a pattern of it. *See Flores*, 758 F.3d at 1160 (citing cases). They have reasoned that the "inappropriateness" of the employee's wrongdoing was "self-evident," so the municipality could not have found it obvious that it needed to train against the wrongdoing. *Kobrick v. Stevens*, 763 F. App'x 216, 221 (3d Cir. 2019); *see also, e.g.*, *Waller*, 932 F.3d at 1288; *Marsh v. Phelps County*, 902 F.3d 745, 753 (8th Cir. 2018); *Flores*, 758 F.3d at 1160; *Doe v. Magoffin Cnty. Fiscal Ct.*, 174 F. App'x 962, 970 (6th Cir. 2006). Likewise, since the employees knew or at least should have known that their conduct was wrongful (and even criminal), these courts have also held that a lack of training did not "cause" the conduct and that additional training would not have prevented it. *See Flores*, 758 F.3d at 1160; *Andrews*, 98 F.3d at 1077; *cf. Currie v. Haywood County*,

234 F. App'x 369, 373 (6th Cir. 2007) (per curiam). Under the version of the facts that Hobbs asserts, these legal rules apply here.

3

Gambrel's contrary arguments lack merit. Alleging that a jury could find deliberate indifference based solely on the Officers' use of force against Mills, she cites the Supreme Court's suggestion in *Canton* that the single-incident theory might apply if a municipality gave no training to officers about the constitutional limits on deadly force. *See* 489 U.S. at 390 n.10. In this case, however, the police academy did train Ashurst on the proper use of force against arrestees (like Mills) who are suspected of being under the influence of drugs, so the case does not involve the complete lack of training that *Canton* hypothesized. *Cf. Peña v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018). Indeed, we have regularly relied on academy training to reject claims against municipalities that offered little additional training themselves. *See Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997); *see also Deruso v. City of Detroit*, 121 F. App'x 64, 66 (6th Cir. 2005); *Franklin v. Messmer*, 111 F. App'x 386, 388–89 (6th Cir. 2004) (per curiam).

Gambrel responds that two recent cases have allowed plaintiffs to obtain trials over failure-to-train claims involving a single incident of alleged excessive force. *See Ouza v. City of Dearborn Heights*, 969 F.3d 265, 289 (6th Cir. 2020); *Wright*, 962 F.3d at 881–82. These cases confirm our conclusion. In *Wright*, we did not rely on a city's *unofficial* custom of failing to train its officers to hold it liable for a single incident. Rather, we relied on "offensive statements and depictions" in the city's *official* training (including, for example, "jokes about Rodney King"). 962 F.3d at 882. We reasoned that a jury could find that the city's problematic training created a culture approving of excessive force and that this culture caused the plaintiff's injury. *Id.* at 881. We would expand *Wright* well beyond its logic if we applied it to this case. Gambrel has not suggested that Knox County had a deliberate policy condoning excessive force. Rather, she seeks to hold the County liable for its alleged deliberate indifference to its inadequate training on the use of force. For the reasons that we have explained, however, she has not shown such indifference.

That leaves *Ouza*. There, the plaintiff claimed that a city's police officers lacked probable cause to arrest her and handcuffed her too tightly when doing so, both in violation of the Fourth Amendment. 969 F.3d at 273. We held that a jury could hold the city liable for this single incident because the city provided no additional training to the officers other than the instruction that they received at the police academy over a decade in the past. *Id.* at 287–89. Yet the proper standards for probable cause and the proper methods for handcuffing arrestees are the types of "technical" issues for which up-to-date training can provide guidance about what is lawful and what is not. *Waller*, 932 F.3d at 1288. So *Ouza* held that a jury might find that it is obvious that officers would need additional training on these technical subjects and that this training would have prevented the alleged improper handcuffing and probable-cause miscalculation. 969 F.3d at 289. The same cannot be said for the gratuitous violence that Hobbs asserted in this case. Unlike mistakes over handcuffing or probable cause, it is "self-evident" that officers cannot beat up and shoot nonresistant arrestees for no apparent purpose. *Kobrick*, 763 F. App'x at 221. So the need for training against this alleged wrongdoing was not obvious, and no amount of additional training would have prevented the allegedly intentional misconduct. *See Waller*, 932 F.3d at 1288.

That conclusion may follow in most cases, Gambrel lastly argues, but Knox County had specific notice of a need to supervise Ashurst. When Knox County hired him, Gambrel says, he had a history of using excessive force at other police agencies. Suffice it to say that none of the prior incidents put Knox County on notice of the type of wrongdoing that Hobbs alleged. Gambrel's cited evidence at best suggests that Ashurst at times "demonstrated immaturity or a poor attitude." *Gambrel*, 476 F. Supp. 3d at 602. And the Supreme Court has held that even an officer's criminal record (including an assault-and-battery conviction) did not suffice to make a county deliberately indifferent to the risk that the officer would use excessive force. *Brown*, 520 U.S. at 412–15. *Brown* forecloses Gambrel's reliance on the prior incidents here.

## C. State-Law Claims

Gambrel also appeals the dismissal of her state-law claims. As relevant now, she brought two state-law causes of action against the Officers (for assault and battery and wrongful death) and one state-law cause of action against the County (for indemnification). Her state-law claims

against the Officers require little analysis.  After rejecting Gambrel's federal claims, the district court declined to exercise supplemental jurisdiction over these state-law claims and dismissed them without prejudice.  *See* 28 U.S.C. § 1367(c)(3).  Because we are partially reversing the court's grant of summary judgment to the Officers on the federal claims, we will likewise reverse its discretionary dismissal of the state-law claims—our normal practice in this setting.  *See Hale v. Boyle County*, 18 F.4th 845, 855 (6th Cir. 2021) (per curiam); *Garcia v. Dykstra*, 260 F. App'x 887, 901 (6th Cir. 2008); *Mills v. City of Barbourville*, 389 F.3d 568, 581 (6th Cir. 2004).

Gambrel's claim against Knox County under Kentucky's indemnification statute requires more discussion.  *See* Ky. Rev. Stat. § 65.2005(1).  The district court dismissed this claim with prejudice at the pleading stage, holding that the Kentucky statute does not permit a tort plaintiff to sue a county over the county's statutory duty to indemnify its tortfeasor employees.  *Gambrel*, 2018 WL 1457296, at *15.  Whether or not correct, this holding was premature.

Courts often find "unripe" claims that one entity (say, an insurer) must indemnify another party (say, a business) for a potential monetary award that a jury might render against that other party in litigation pending against it.  *See, e.g.*, *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 200 (4th Cir. 2019); *Jackson v. City of Cleveland*, 925 F.3d 793, 807–09 (6th Cir. 2019); *Mid-Continent Cas. Co. v. Delacruz Drywall Plastering & Stucco, Inc.*, 766 F. App'x 768, 770 (11th Cir. 2019) (per curiam); *Willbros RPI, Inc. v. Cont'l Cas. Co.*, 601 F.3d 306, 313 (5th Cir. 2010) (per curiam); *Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003).  This question has an "advisory quality" to it if a jury has yet to issue the monetary award, and a court may never have to answer the question if, say, the jury finds the insured not liable.  *Lear*, 353 F.3d at 583.

Our opinion in *Jackson* demonstrates this ripeness rule.  There, the plaintiffs brought a state-law claim against the City of Cleveland (in addition to claims against individual officers) under an Ohio indemnification statute like the Kentucky statute at issue here.  925 F.3d at 802.  The district court granted judgment on the pleadings to Cleveland, reasoning that the statute "provides only a tortfeasor employee, and not a tort victim, with the right to bring a claim of indemnification against the tortfeasor's employer."  *Id.* at 807.  We reversed this with-prejudice dismissal.  We explained that courts generally treat indemnification questions as unripe "until the

underlying claim is adjudicated." *Id.* at 808. Admittedly, we also noted that some courts apply an exception to this principle when an indemnification claim has no chance of succeeding. *Id.* Yet this potential exception did not apply in *Jackson* because the plaintiffs' indemnification request was not patently meritless. *See id.* We reasoned that the Ohio Supreme Court had yet to answer the state-law question and that the court might hold that a tort plaintiff could invoke the indemnification statute to sue a tortfeasor's governmental employer. *Id.*

The same logic applies here. Gambrel's indemnification claim against Knox County has yet to ripen because her tort claims against the Officers remain pending. *Id.* at 807–08. As in *Jackson*, moreover, we need not address the validity of the exception to ripeness for claims with no chance of success. *Id.* at 808. Like the Ohio Supreme Court in *Jackson*, the Kentucky Supreme Court has yet to opine on this state-law question. Even if the chances that the court would adopt Gambrel's reading are "remote," that result "is far from impossible[.]" *Id.*; *but cf. Gaeta v. Louisville Metro Police Dep't*, 2021 WL 5264185, at *4 (Ky. Ct. App. Nov. 12, 2021). So the district court acted prematurely in dismissing this unripe claim with prejudice.

Citing *Jefferson County Commonwealth Attorney's Office v. Kaplan*, 65 S.W.3d 916 (Ky. 2001), and *Schwindel v. Meade County*, 113 S.W.3d 159 (Ky. 2003), Knox County suggests that the Kentucky Supreme Court has already foreclosed Gambrel's reading. Yet neither case answers the question. In *Kaplan*, a criminal defendant sued his lawyer for malpractice, and the lawyer then filed a third-party complaint against, among others, the prosecutors. 65 S.W.3d at 918. The Kentucky Supreme Court upheld the dismissal of the third-party complaint because absolute immunity protected the third-party defendants. *Id.* at 921. *Kaplan* thus does not concern (or even cite) the indemnification statute. *Schwindel* at least discusses that statute. But it held only that § 65.2005(1) did not waive a county's immunity from suit. 113 S.W.3d at 167. In that case, the tort plaintiffs sought to hold the county vicariously liable; they did not sue its employees or allege that the statute required the county to indemnify the employees for any judgment against them. *Id.* Contrast that with Gambrel's complaint. It does not seek to hold Knox County vicariously liable. Instead, it seeks to hold the Officers liable and could be read as simply asking for a declaratory judgment that the indemnification statute requires Knox County to pay this judgment.

* * *

In sum, qualified immunity protects the Officers for their initial use of force to recover Mills's daughter, and Gambrel has failed to show that a reasonable jury could find Knox County liable under *Monell*. At the same time, a jury must resolve the factual disagreements underlying whether the Officers used reasonable force during the second and third stages of their confrontation with Mills. We also reverse the district court's resolution of the remaining state-law claims. We thus affirm in part, reverse in part, and remand for proceedings consistent with this opinion.