RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0071p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MARQUETTA WILLIAMS, Individually and as
Administratrix of the Estate of James Williams,
Deceased,

*Plaintiff-Appellee,*

*v.*

CITY OF CANTON, OHIO, et al.,

*Defendants,*

ROBERT HUBER, c/o Canton Police Department,

*Defendant-Appellant.*

No. 25-3304

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:23-cv-00655—Benita Y. Pearson, District Judge.

Argued: October 27, 2025

Decided and Filed: March 6, 2026

Before: READLER, MURPHY, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Gregory A. Beck, BAKER | DUBLIKAR, North Canton, Ohio, for Appellant.
Justin J. Hawal, DICELLO LEVITT LLP, Mentor, Ohio, for Appellee. **ON BRIEF:** Gregory
A. Beck, Mel L. Lute, Jr., Andrea K. Ziarko, BAKER | DUBLIKAR, North Canton, Ohio, for
Appellant. Justin J. Hawal, Robert F. DiCello, Kennth P. Abbarno, DICELLO LEVITT LLP,
Mentor, Ohio, for Appellee.

———————

**OPINION**

———————

MURPHY, Circuit Judge.  Since the Founding, some Americans have celebrated New Year's Day by dangerously shooting firearms into the air.  We must decide whether a police officer violated clearly established Fourth Amendment law when the officer used deadly force to stop this gunfire.  At midnight on New Year's Day in Canton, Ohio, James Williams fired dozens of shots into the air from a patio enclosed by a wooden privacy fence.  Officer Robert Huber drove to the scene to investigate.  Soon after Huber arrived, Williams began a second volley of this celebratory gunfire.  Without giving a warning, Huber fatally shot Williams through the fence.

When Williams's wife sued, Huber asserted a qualified-immunity defense.  But this case's key factual dispute belongs to a jury.  On the one hand, Huber testified that he shot at Williams because he saw Williams turning the rifle toward him and feared for his life.  Under this view of the facts, Huber would have complied with the Fourth Amendment because he had probable cause to believe that Williams posed a serious risk of harm.  On the other hand, video evidence would permit a reasonable jury to find that Huber saw Williams keep firing into the air the entire time.  Under this view of the facts, Huber would have violated the Fourth Amendment because he lacked probable cause to believe that Williams posed a threat.  And any reasonable officer would have recognized that the police may not (without warning) shoot a man when the only information they have about his "threat" status is that he was committing what Canton treats as a misdemeanor: discharging a gun into the air just after midnight to celebrate New Year's Day.  The district court thus properly denied summary judgment to Huber.  We affirm.

I

Whenever a shooter fires a gun into the air, a risk exists that the bullet will hit someone on its way to the ground.  It is thus not difficult to find tragic stories of this gunfire injuring or even killing bystanders.  *See generally* Ethan Siegel, *The Science of Why Firing Your Gun Up Into the Air Can Be Lethal*, Forbes (Jul. 2, 2020).  Yet some Americans have long had a

dangerous fondness for celebrating holidays by firing firearms upward. For centuries, then, American cities have sought to deter celebratory gunfire after the clock strikes midnight on New Year's Day. *See United States v. Rahimi*, 602 U.S. 680, 691 (2024) (citing 5 Colonial Laws of New York ch. 1501, pp. 244–46 (1894)). In 1774, for example, Pennsylvania's legislature explained that the "disorderly practice . . . of firing guns at or near New Year's Day" had been "frequently attended with much mischief and greatly disturb[ed] the public peace[.]" 8 Statutes at Large of Pa. from 1682 to 1801, at 410 (1902). Yet the problem persists. It has allegedly been "customary" in Canton, Ohio, for gunowners to shoot firearms at midnight on New Year's Day. Williams Dep., R.79-1, PageID 2017; Gabbard Dep., R.73, PageID 970. So Canton has made it a misdemeanor to discharge a firearm in the city. *See* Canton City Ordinance § 549.03.

This case shows that this dangerous practice can have tragic results in other ways. Officer Robert Huber has worked as a police officer for the City of Canton Police Department since 2013. At 10:00 p.m. on December 31, 2021, he reported for work to perform his "regular patrol duties" in the overnight hours. Huber Dep., R.78-1, PageID 1850, 1891. At the start of his shift, Huber learned that "at least three or four people" had already been shot in Canton. *Id.*, PageID 1894. He patrolled around the city for the first couple of hours. Shortly after midnight, he heard a "volley of probably 20 shots pretty close to" him about a block away. *Id.*, PageID 1896. The "continual unstopping series" of shots led Huber to presume that the shooter was firing a rifle. *Id.*, PageID 1897. Huber alerted dispatch and drove toward the gunfire to identify the shooter's location.

Williams and some family members were the source of the gunfire. As the family had done in years past, they chose to fire many shots into the air to celebrate the start of 2022. The Williams family engaged in this dangerous activity from a small patio that was off the side of their house and enclosed by a "privacy fence" made of wooden slats. Williams Dep., R.79-1, PageID 2019. Williams's wife recorded a video of the celebratory fire with her cellphone. She (and various children) can be heard on the video counting down the seconds until New Year's Day. After the countdown, the video shows Williams and two others firing various weapons (including a rifle, a shotgun, and a pistol) for several minutes. These individuals were discharging the weapons at a "10 o'clock or sort of a 70-degree angle" into the air. Williams

Dep., R.79-1, PageID 2003. Williams's wife also heard neighbors firing "a lot" of other shots around the neighborhood. *Id.*, PageID 2001. When the initial firing ceased, Williams walked inside the home, put the rifle down, and told the video that he would start "round two" after he reloaded. Cellphone Video, Ex. C, at 4:32–:35, R.81-3, PageID 2361.

The first round of firing stopped before Huber reached the Williams home. As Huber got there about six minutes after midnight, he spotted a man walking into the house. Huber called dispatch for backup and got out of his unlit cruiser to investigate. He walked up to the front porch and believed he saw the man through the front window "putting the rifle away." Huber Dep., R.78-1, PageID 1906. Huber did not announce his presence at this point. He instead continued to walk back and forth near the front of the house while waiting for backup. All remained quiet.

Suddenly, though, Huber heard a barrage of loud gunfire coming from the patio-side of the house as he stood at the other side. Williams had returned to the patio and started firing "a Ruger Semiautomatic AR-556 with a 50-round drum magazine" into the air. Stip., R.69, PageID 334. Unsure what was happening, Huber drew his firearm and raced to the patio-side of the house.

Huber's bodycam and the house's surveillance video captured what occurred when Huber approached the patio from which Williams was shooting the rifle. According to Huber, he could see Williams's "forehead" above the privacy fence and "a rifle barrel" "in between the" fence's wood slats. Huber Dep., R.78-1, PageID 1910. Huber also testified that he could see the "large amount of" "muzzle flash" as Williams repeatedly shot the rifle, but that he could not see Williams's hands, face, or body position and admitted that he did not "kn[o]w what [Williams's] intentions were." *Id.*, PageID 1911.

When Huber got to a short distance from the enclosed fence, he asserted that he "observed the firearm coming towards" him and concluded that his "life was in danger" from the man on the other side. *Id.*, PageID 1917, 1925. Huber thus decided that he needed to shoot at Williams to save his own life. Without shouting a warning, Huber discharged eight rounds into the fence. Williams stopped shooting. Huber immediately told dispatch "shots fired, shots

fired" and yelled at Williams "police, get down now."  Huber Bodycam, Ex. B, at 1:18–:22, R.81-2, PageID 2359.  Huber then retreated to a location behind his cruiser while backup arrived.  All told, Williams had discharged about 39 rounds in about 8.5 seconds before Huber opened fire.

Huber's shots through the fence hit Williams six times.  When Huber fired, Williams's wife had been standing close to him inside the house while holding the patio door open.  Williams told her "[g]o, go, go, they're shooting," and they both "ran back into" their home.  Williams Dep., R.79-1, PageID 2007.  They made it to the dining room, where Williams told his wife "that they shot him and that he had been hit."  *Id.*  He "lowered his body to the ground" and lay on the floor.  *Id.*  Not knowing who had shot at them, his wife called 911.  One of their scared daughters ran upstairs, saw the police out the window, and told her mother.  Williams's wife rushed outside to meet them, believing that the police were responding to her 911 call.  Officers took Williams to a hospital, but doctors could not save his life.

On behalf of Williams's estate, his wife sued Huber and the City of Canton under 42 U.S.C. § 1983.  She brought an excessive-force claim against Huber under the Fourth Amendment.  And she sought to hold the city liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Huber moved for summary judgment on qualified-immunity grounds.  The district court denied his motion.  *See Williams v. City of Canton*, 2025 WL 949370, at *13 (N.D. Ohio Mar. 30, 2025).  It reasoned that a dispute of fact existed over whether Williams had moved the rifle in Huber's direction when Huber shot into the fence.  *See id.* at *10, *13.  And the court held that Huber would have violated clearly established Fourth Amendment law if Williams had remained firing into the air when Huber shot him.  *See id.* at *6–13.

II

Huber appealed the district court's denial of his qualified-immunity defense.  To rebut that defense, Williams's wife must establish two things: that Huber used excessive force in violation of "the Fourth Amendment" and that the caselaw "clearly established" this violation at the time of Huber's actions.  *Gambrel v. Knox County*, 25 F.4th 391, 399 (6th Cir. 2022).

We review the district court's summary-judgment denial of qualified immunity de novo. *See id.* Before doing so, however, we must consider the initial claim that we lack jurisdiction over Huber's appeal.

## A. Jurisdiction

We typically have jurisdiction only over "final decisions" that end a suit. 28 U.S.C. § 1291. At the same time, the collateral-order doctrine gives us early jurisdiction to review an otherwise nonfinal decision denying qualified immunity. *See Mitchell v. Forsyth*, 472 U.S. 511, 525–27 (1985). But this doctrine does not allow us to review all issues embedded in a qualified-immunity denial. Rather, we have jurisdiction only over certain questions. *See DeVooght v. City of Warren*, 157 F.4th 893, 898–99 (6th Cir. 2025); *Heeter v. Bowers*, 99 F.4th 900, 908 (6th Cir. 2024).

As relevant here, we have jurisdiction to review two main questions in excessive-force cases. We may review a mixed question of law and fact: Does the evidence (when interpreted in the plaintiff's favor) show that a police officer used excessive force under the Fourth Amendment? *See Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014); *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). And we may review a purely legal question: Did the caselaw "clearly establish[]" this Fourth Amendment violation at the time the officer acted? *Plumhoff*, 572 U.S. at 773.

On the other hand, the Supreme Court's caselaw has adopted complex rules when a police officer raises a "question of 'evidence sufficiency'"—that is, a question about "which facts [the plaintiff] may, or may not, be able to prove at trial." *Id.* at 772 (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). When an officer raises *only* that type of question, we lack jurisdiction to consider the appeal. *See Johnson*, 515 U.S. at 313–18. When, by contrast, an officer's appeal raises one of the two reviewable questions, the officer may argue that the evidence "blatantly contradict[s]" the district court's conclusions about the facts that a reasonable jury could find. *Scott*, 550 U.S. at 380. And we may consider this evidence-sufficiency question in the process of answering one of the reviewable excessive-force questions. *See id.*; *DeVooght*, 157 F.4th at 899–900. If, though, the evidence would permit a reasonable

jury to find the challenged facts that the district court identified, an officer must accept those facts when raising both reviewable questions. *See Heeter*, 99 F.4th at 909. So if an officer's answers to these reviewable questions *depend* on the officer's competing view of the disputed facts, we will dismiss the appeal for lack of jurisdiction. *See id.*

This complex law gives us jurisdiction over the issues that Huber raises on appeal—although we warn his counsel that his briefs come close to improperly relying on disputed factual questions. At the outset, Huber raises the two reviewable issues. He argues *both* that his decision to shoot at Williams through the fence constituted reasonable (not excessive) force *and* that this decision at least "did not violate clearly established law." *Plumhoff*, 572 U.S. at 773. As part of these challenges, Huber also argues that the evidence "blatantly contradict[s]" two facts that the district court held a reasonable jury could find: that celebratory gunfire "is a popular occurrence in Canton" and that Williams made no "threatening movements" toward Huber when Huber fired. *Scott*, 550 U.S. at 380; *Williams*, 2025 WL 949370, at *10, *13.

Yet Huber's two evidence-sufficiency challenges lack merit because "a reasonable jury" could find both facts. *DeVooght*, 157 F.4th at 900. For one thing, Williams's wife testified that Canton residents often engage in celebratory gunfire just after midnight on New Year's Day and that many neighbors were doing so on the night in question. Williams Dep., R.79-1, PageID 2017. The Chief of Police also recognized "the practice of Canton residents celebrating New Years by discharging firearms . . . into the air referred to as celebratory gunfire[.]" Gabbard Dep., R.73, PageID 970. Even if contrary evidence exists on the question, this testimony suffices to create a genuine issue of material fact suitable for trial. *See Gambrel*, 25 F.4th at 404.

For another thing, the surveillance video from the Williams home does not show Williams moving the gun toward Huber. Rather, Williams appears to fire it into the air (at a slight angle) the entire eight or so seconds before Huber shoots him. Surveillance Video, Ex. D, at 2:54–3:04, R.81-4, PageID 2363. To be sure, Huber testified that he fired because he saw "the firearm coming towards" him and feared for his life. Huber Dep., R.78-1, PageID 1917, 1925. And we recognize that neither the surveillance video nor Huber's bodycam reveals what Huber saw (from a far different angle). *Id.*, PageID 1920–21. Still, this evidence would allow a

reasonable jury to conclude that Huber did not perceive the gun coming toward him. *See Gambrel*, 25 F.4th at 404.

We thus would have jurisdiction to consider the constitutional and qualified-immunity questions *if* Huber accepts (for now) that Williams never moved the rifle toward him and that Canton residents commonly engage in celebratory gunfire on New Year's Day. Yet Huber comes close to *not* accepting these facts. He instead repeatedly asks us to consider whether the Fourth Amendment allowed him to shoot because he saw Williams's rifle "coming down directly toward him." Appellant's Br. 29; *see id.* at 12–14, 31, 36–37. And he asks us to ignore the alleged "'tradition' of 'celebratory gunfire'" in Canton. Reply Br. 3. Are these disputed facts so "crucial to" Huber's appeal that we lack jurisdiction over it? *Heeter*, 99 F.4th at 909 (citation omitted). We find the question close because his briefing offers little constitutional or qualified-immunity analysis when construing these facts against his position. But he does argue, in the alternative, that "there was no violation of" clearly established law "even assessing the facts in the light most favorable to" Williams's wife. Reply Br. 23; Oral Arg. 14:21–:49; *see also Est. of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2002). We thus conclude that he has done enough (if barely) to raise the reviewable questions on which we have jurisdiction. *See Heeter*, 99 F.4th at 910–11.

## B. Merits

If a jury were to resolve the factual disputes in favor of Williams's wife, she would have surmounted both parts of the qualified-immunity test: Huber would have used excessive force under the Fourth Amendment, and any reasonable officer would have recognized this violation. *See Gambrel*, 25 F.4th at 399. We will discuss each part in turn.

### 1. Constitutional Violation

The Fourth Amendment protects "the right of the people to be secure in their persons . . . against unreasonable . . . seizures[.]" U.S. Const. amend IV. All agree that Huber's "application of force" (shooting Williams) qualified as a "seizure." *Torres v. Madrid*, 592 U.S. 306, 318 (2021). This case thus turns on whether this force was "unreasonable." *See Barnes v. Felix*, 605 U.S. 73, 78–79 (2025). To decide on the reasonableness of force, the Supreme Court

has balanced an officer's reasons for using the force against a suspect's interest in avoiding it. *See Chaney-Snell v. Young*, 98 F.4th 699, 715–16 (6th Cir. 2024) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985)). When undertaking this balancing, courts must consider all the facts from a reasonable officer's objective perspective. *See Barnes*, 605 U.S. at 79–80. Courts should also recognize that the police often must "make split-second judgments" in dangerous situations, so they should avoid judging police conduct with "the 20/20 vision of hindsight." *Plumhoff*, 572 U.S. at 775 (quoting *Graham*, 490 U.S. at 396–97).

This balancing approach continues to apply when an officer uses the type of "deadly force" that can kill a suspect. *Garner*, 471 U.S. at 9. Because a suspect has a "fundamental interest in his own life," the Supreme Court has held that the police may use this force only when an officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]" *Id.* at 9, 11; *see Baker v. City of Trenton*, 936 F.3d 523, 533 (6th Cir. 2019). Any number of "factbound" situations can create the required probable cause. *Scott*, 550 U.S. at 383. If, for example, a suspect takes officers on a dangerous high-speed chase that risks the lives of others on the road, officers can shoot the suspect to end the chase. *See Plumhoff*, 572 U.S. at 776–77. And if a suspect who has resisted arrest leads the police to reasonably fear that he "might fire a gun at them," the officers can shoot the suspect to eliminate this threat. *Gambrel*, 25 F.4th at 405; *see Presnall v. Huey*, 657 F. App'x 508, 512 (6th Cir. 2016).

Here, though, when we interpret the evidence in the light most favorable to Williams's wife, Huber lacked probable cause to believe that Williams "pose[d] a threat of serious physical harm" to him. *Garner*, 471 U.S. at 11. To start, the facts that Huber reasonably should have known before opening fire suggested a strong likelihood of celebratory gunfire and so undercut any claim that Williams posed a threat to him. *See Barnes*, 605 U.S. at 80. True, Huber had heard many gunshots seemingly from a rifle before he arrived at the Williams home. Yet it was shortly after midnight on New Year's Day. When interpreting the facts in the light most favorable to Williams's wife, Huber reasonably should have known that celebratory gunfire was common in Canton at this time. And nothing at the scene would have eliminated that belief.

When he got there, Huber saw a man casually walk inside the home from a patio and put a rifle down. Things were calm. Apart from the gunshots, Huber saw no evidence of violence or criminal activity. Nobody had called 911 to report a shooting or ask for police. Nobody was screaming. And the man did not threaten Huber or try to evade him. *See Graham*, 490 U.S. at 396. These facts "inform the reasonableness" of Huber's actions when he heard Williams begin to fire his rifle again. *Barnes*, 605 U.S. at 80–81.

Next, Williams's conduct "at the precise time" that Huber shot him would have further undercut any need for immediate deadly force. *Id.* at 80. At that point, Huber certainly had probable cause to believe that Williams was committing a crime (indeed, many crimes) by discharging a firearm within city limits. *See* Canton City Ordinance § 549.03. These crimes likely would have allowed Huber to arrest Williams and use the force necessary to carry out the arrest. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 323 (2001); *Graham*, 490 U.S. at 396. Still, Canton's city council has classified this offense as a mere misdemeanor. *See* Canton City Ordinance § 549.03; *see also Eastep v. City of Nashville*, 156 F.4th 819, 829 (6th Cir. 2025). Even at common law, officers could not use deadly force to catch "a fleeing misdemeanant" and instead could do so only if the misdemeanant posed a threat. *See Garner*, 471 U.S. at 12; *cf. Chaney-Snell*, 98 F.4th at 716–17. And a reasonable jury could conclude that Huber perceived a man firing a rifle *into the air*—something consistent with celebratory gunfire. The jury likewise could conclude that the man never moved the rifle in a threatening manner toward Huber. Before Huber shot, moreover, he never shouted a warning or identified himself. So Huber likely should have realized that the man did not even know he was there. Huber also did not know "what [the man's] intentions were" when firing the rifle into the air. Huber Dep., R.78-1, PageID 1911.

All told, a man's reckless (but unfortunately common) decision to fire a rifle into the air just after midnight on New Year's Day does not—*without more*—give officers the required probable cause to "shoot[] him dead." *Garner*, 471 U.S. at 11. And here, Huber has identified nothing more when we interpret the record in the light most favorable to Williams's wife.

Huber's two contrary arguments lack merit. For the most part, Huber asserts that Williams posed an immediate threat to his life because he perceived Williams's rifle "coming

down directly toward him" when he fired. Appellant's Br. 29–31, 36–37; Reply Br. 19–22. If he can convince the jury of this fact, we agree that his conduct would have comported with the Fourth Amendment. The police may use deadly force when they reasonably (if mistakenly) perceive a suspect pointing a gun at them. *See Gambrel*, 25 F.4th at 405–06; *Presnall*, 657 F. App'x at 512. The problem for Huber? As we have said, a genuine dispute of material fact exists over whether Williams moved the rifle in a way that could have led Huber to perceive it turning toward him. At this stage of the case, then, we must interpret the facts in the light most favorable to Williams's wife. *See Gambrel*, 25 F.4th at 400, 404. So Huber may not now rely on this factual justification—the one that he gave in testimony and in his interview with investigators—as the basis for shooting Williams. Rather, he must save this self-defense justification for the jury.

Huber also makes a passing reference to the threat that Williams's gunfire posed to others, suggesting that "falling bullets" might have struck others. Appellant's Br. 26 (quoting Huber Dep., R.78-1, PageID 1935). But Huber did not meaningfully advance this argument. His opening brief devoted one sentence to it. *See id.* His reply did not invoke it at all. Reply Br. 19–22. And when asked at argument if officers could (without warning) fire at "people who [they] know are shooting in the air in celebration," Huber's counsel forthrightly conceded: "The direct answer to that question is probably not." Oral Arg. 4:04–:17. Further, Huber offers no evidence to support the claim that a falling-bullets risk creates the "significant threat" of harm that would justify deadly force. *Garner*, 471 U.S. at 3. He does not tell us how many people were outside at the time of the shooting. And he does not identify anything that could help us even quantify the chances that a bullet falling from the sky might hit someone. Is the chance one in one thousand? One in one million? We do not know. But we do know that Canton has treated this crime as a misdemeanor. And we know of no case that has given the police the right to shoot a suspect—without warning—to stop an ongoing misdemeanor without probable cause that the suspect's conduct posed a threat to the officers or others. In short, Huber violated the Fourth Amendment under the facts that a reasonable jury could find.

2. Clearly Established Law

Yet qualified immunity shields officers from damages liability for constitutional violations unless they act in a "plainly incompetent" manner or "knowingly violate the law." *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (per curiam) (citation omitted). To overcome a qualified-immunity defense, a plaintiff must show that an officer's use of force conflicted with "clearly established" law. *Id.* (citation omitted). Plaintiffs also cannot identify the "clearly established law" on which they rely "at a high level of generality." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (citation omitted). Take the constitutional right that bars the police from making "unreasonable" "seizures." U.S. Const. amend. IV. When framed at this sky-high level of generality, the right often will not alert officers that a specific arrest violated the Fourth Amendment. *See District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018). And a plaintiff has defined a legal right at this inappropriately high level whenever "the unlawfulness of the officer's conduct 'does not *follow immediately* from'" the identified right. *Id.* (citation omitted) (emphasis added). In that circumstance, the plaintiff must instead identify "a body of relevant case law" more specifically tailored to a given case. *Id.* (citation omitted).

The Supreme Court regularly applies these principles to excessive-force cases. *See, e.g.*, *City of Tahlequah*, 595 U.S. at 12–13; *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021) (per curiam); *Kisela*, 584 U.S. at 104–05; *White v. Pauly*, 580 U.S. 73, 79–80 (2017) (per curiam); *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam). It has repeatedly recognized that *Garner* articulated its deadly-force test (that officers may use deadly force only if a suspect poses a threat of serious harm) "at a high level of generality." *Rivas-Villegas*, 595 U.S. at 6 (quoting *Brosseau*, 543 U.S. at 199); *see Garner*, 471 U.S. at 3, 11. This test might supply the required clearly established law in "an obvious case" in which all reasonable officers would have immediately known that a suspect did not pose the required threat. *Rivas-Villegas*, 595 U.S. at 6. Otherwise, a plaintiff "must identify a case" that found a similar use of force illegal and thus would have alerted the officer that the specific force exceeded constitutional bounds. *Id.*

Applying these standards here, we must ask: Would all "reasonable" police officers "have understood" that they could not shoot a person without warning for discharging a rifle into the air in what was likely celebratory gunfire just after midnight on New Year's Day? *Id.* at 5

(quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)).  Although we agree with Huber that there are no cases like this one, this fact pattern is one of the rare "obvious" ones in which *Garner*'s general test clearly establishes the violation.  *Id.* at 6; *see Wesby*, 583 U.S. at 64.

Consider a few examples of "obvious" cases from our court.  We have found it obvious that an officer may not shoot a drug suspect several times in the back as the suspect ran away and the officer had no basis to believe that he was armed.  *See Bouggess v. Mattingly*, 482 F.3d 886, 888, 896 (6th Cir. 2007).  We have likewise found it obvious that officers cannot shoot a suspect for merely possessing a firearm without more evidence that the suspect poses a threat.  *See Redrick v. City of Akron*, 2021 WL 5298538, at *5 (6th Cir. Nov. 15, 2021); *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019).  And we have found it obvious that an officer may not shoot an unarmed burglar for following the officer's command to exit the cabinet in which he was hiding.  *See Sample v. Bailey*, 409 F.3d 689, 697, 699 (6th Cir. 2005).  What factor ties all these cases together?  It should have "follow[ed] immediately from" *Garner*'s test for deadly force that the officer could not shoot the suspect in the given situation.  *Wesby*, 583 U.S. at 64 (citation omitted).

The same is true here.  When taking the facts in the light most favorable to Williams's wife, "the unlawfulness of" Huber's conduct would "follow immediately from" *Garner*'s holding that an officer may not shoot a suspect unless the suspect poses a threat of serious physical harm to the officer or others.  *Id.*  It is immediately apparent to us that officers may not immediately fire upon a man engaged in the common practice of shooting a weapon into the air from his home in the moments after midnight on New Year's Day.  As we have said, Williams was at most committing a misdemeanor.  And what officer would think that, without probable cause that a misdemeanant posed some threat, he could shoot the misdemeanant to end an ongoing misdemeanor?  Under the "particularly egregious facts of this case" (when interpreted in the light most favorable to Williams's wife), all "reasonable" officers would have recognized that they should not attempt to kill a nonthreatening (if reckless) New Year's reveler.  *Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (per curiam).

In response, Huber argues that this case cannot be an obvious one because Williams was "actively shooting a weapon" (not just in possession of it) when Huber fired at him.  Appellant's

Br. 40.  But any reasonable officer would recognize that the police do not have an *automatic* right to immediately shoot in the direction of gunfire whenever they hear it.  If, for example, gunfire emanated from a large rural property in an area where makeshift shooting ranges were common, no reasonable officer would (without warning) fire on the property without first investigating whether the owners had set up one of these shooting ranges.  And at least under the version of events that we must accept now on this summary-judgment record, Huber likewise should have known that the common practice of celebratory gunfire just after midnight on New Year's Day, while dangerous, did not pose an imminent threat to him or others.

To be clear, our holding is narrow.  If officers had any additional information to believe that a risk existed to themselves or others, the outcome might differ under the governing "totality of the circumstances" (and thus fact-dependent) test.  *Barnes*, 605 U.S. at 80 (citation omitted).  Suppose that an officer fired at a man shooting a weapon into the air after receiving a 911 call of an ongoing crime.  Or suppose that a man suddenly and strangely shoots a rifle into the air on a random day in a crowded park or during a parade.  Or suppose that a man continues to fire a rifle into the air even after receiving an officer's warning to stop.  Our holding in this case says nothing about the right results in these hypothetical scenarios with materially different facts.

We affirm.